GRITZ HARVESTORE, INC., Plaintiff,

v.

A.O. SMITH HARVESTORE PROD-
UCTS, INC., Defendant-Appellee,

v.

L.H. GRUETZMACHER, et al., Third-
Party Defendant-Appellant.

No. 84–1634.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 13, 1985.

Decided Aug. 5, 1985.

As Amended on Denial of Rehearing
Oct. 31, 1985.

Charles F. Graupner, Michael, Best & Friedrich, Milwaukee, Wis., for plaintiff.

Anne Reed, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, Wis., for defendant-appellee.

Before CUMMINGS, Chief Judge, ESCHBACH, Circuit Judge, and SWYGERT, Senior Circuit Judge.

SWYGERT, Senior Circuit Judge.

In this diversity action, Gritz Harvestore, Inc. ("Gritz") sued A.O. Smith Harvestore Products, Inc. ("Harvestore") for terminating its dealership. Harvestore counterclaimed against the dealership, Gritz, and its guarantors, Carmen, Elaine, and Jim Gruetzmacher, for the value of goods that had been shipped to Gritz, but that had never been paid for. Carmen and Elaine Gruetzmacher stipulated to a consent judgment. Carmen also agreed to indemnify Jim Gruetzmacher, the appellant in the instant case, for any liability that he might incur to Harvestore. The appellant contested liability and argued that his guaranty was unenforceable. After hearing all of appellant's evidence, the district judge disagreed. She therefore entered judgment against the appellant in the amount of $561,254.72 plus $261.09 per day interest from December 31, 1983, which represents a principal debt of $332,139 plus interest. Jim Gruetzmacher appealed to this court, and we reverse and remand for further proceedings.

I

In 1970 the appellant and his brother Carmen sought a silo dealership from Harvestore. As a condition to receiving the dealership, the brothers were each required to sign an absolute and unconditional personal guaranty in favor of Harvestore for any debts owed Harvestore by the dealership. The brothers executed these guaranties on May 27, 1970. The appellant testified that he only "glanced" at the guaranty before signing it and that he did not retain a copy of it; he claimed he was not aware of any written revocation provision.

On June 12, 1970, Gritz and Harvestore executed a dealership agreement by which Gritz became Harvestore's dealer in a central Wisconsin territory. For a capital investment of $245.00, the appellant received 49% of the stock of Gritz; Carmen, who invested $245.00, as well as land, buildings, and equipment in the dealership, received 49% of the stock; Carmen's attorney received two percent of the stock. The brothers operated the dealership harmoniously for approximately three years. In 1974 the brothers' relationship, however, began to deteriorate. Without consulting the appellant, Carmen exchanged a part of Gritz' market territory for territory of another Harvestore dealership, Fox Harvestore, also located in central Wisconsin. Carmen was the sole owner of Fox Harvestore, a dealership that Harvestore subsequently terminated in 1976. The appellant objected to the exchange, claiming that it reduced Gritz' market potential by three to four percent. The appellant never informed Harvestore, however, about his objections. Harvestore, although aware of the exchange, did not object.

The disagreement between the brothers continued. In 1975, with Harvestore's consent, Carmen involuntarily terminated his brother from his positions as general manager, officer, director, and employee of Gritz. The appellant subsequently commenced a lawsuit against Carmen alleging

gross and fraudulent mismanagement and seeking, among other things, to have the Gritz franchise divided between himself and Carmen. In the same year, Harvestore reduced Gritz' credit line to zero. That reduction lasted until 1977, when at Carmen's request, it was reinstated. As a condition to reinstatement, Harvestore requested additional collateral from Gritz and Carmen and Elaine, but not from the appellant. Harvestore also requested additional guaranties from Carmen, Elaine, and the appellant and his wife, LaVon. Harvestore claimed it requested the guaranties because in 1970 it had unintentionally failed to secure additional guaranties from each of the brothers' wives. Carmen and Elaine signed the new guaranties, but the appellant and his wife refused because the appellant believed that these guaranties were new and were meant to replace the 1970 guaranty that was no longer enforceable.

The appellant contacted a lawyer, Gaar Steiner, to help him resolve Harvestore's request for additional guaranties. He forwarded Harvestore's letter requesting the additional guaranties to Steiner, but he threw away the copies of the blank guaranties. Steiner telephoned Harvestore's attorney, David Sullivan, to inform him that neither the appellant nor his wife would execute new guaranties. He also told Sullivan that he thought the appellant's 1970 guaranty was unenforceable because of changed circumstances. Sullivan replied that he was "probably right," but he never specifically agreed that it was unenforceable. Sullivan agreed, but failed, to send Steiner a copy of the 1970 guaranty. Steiner made no effort to follow up his request for a copy of the 1970 guaranty, nor did he attempt to revoke it. During that same year, the appellant's shareholdings in Gritz were involuntarily diluted from 49% to 14%.

In November 1980, after protracted negotiations, Carmen and his brother settled the lawsuit originally brought in 1975. The appellant agreed to surrender all of his stock; in exchange, Carmen agreed to pay his brother approximately $300,000, with the payments to be made in installments. Only $200,000 has been paid thus far. Carmen and Gritz have defaulted on the remaining payments. The appellant also obtained a release from all liability, past and future, for the debts of Gritz. Harvestore was aware of the terms of this settlement.

In January 1981 Harvestore decided to terminate the Gritz franchise. Harvestore informed Gritz by letter dated January 16 that as of April 20, 1981, the franchise would be terminated. As of January 30, 1981, Gritz' outstanding debt with Harvestore was $356,909. In late February Harvestore offered to purchase the Gritz franchise for approximately $1.5 million, including $500,000 for goodwill in the form of a covenant not to compete.

The termination date was subsequently revised to June 30, 1981.[1] During June 1981 Carmen entered into an agreement to sell the rights to two-thirds of Gritz' dealership territory to neighboring dealerships. It is unclear from the record when these sales actually were completed.[2] Carmen received approximately $500,000 in "blue sky" (value above the actual asset value of the dealership) from both sales. Harvestore was required to and did approve these sales, but it did not condition its approval on the use of the sales proceeds to repay Gritz' outstanding debt to Harvestore. Harvestore involuntarily terminated the remaining one-third of the dealership and assigned it to a new dealer on June 30, 1981 (July 23, 1981). The appellant was never informed about any of these sales of

1. Some evidence in the record suggests that the termination date was again revised to July 29, 1981. Other evidence suggests that the dealership was actually terminated on July 23, 1981.

2. In its letters to Carmen approving the sales, Harvestore observed that the transactions had to be completed on or before July 20, 1981. The sales, however, could have been completed before that date.

territories, although he may have been aware of the efforts to sell Gritz.

Notwithstanding the fact that Harvestore knew that it was going to terminate the dealership, it continued to sell goods to Gritz on credit through September 1981. The promissory notes for which Jim Gruetzmacher was held liable—a face amount of $332,139—were all executed after the initial termination date of April 30, 1981.[3] Apparently, the date of the making of each promissory note corresponded to the date on which Harvestore's products paid for by the note were shipped to Gritz. According to the dates and amounts contained in the notes, Harvestore shipped $137,410 worth of goods to Harvestore between April 30 and June 30, 1981; and it shipped $194,718.07 worth of goods from July 1 to September 1, 1981.[4] Thus, even after Harvestore had involuntarily terminated the last one-third of the dealership on June 30, 1981 (July 23, 1981), it continued to ship approximately $195,000 ($130,000) worth of goods to Gritz. More than $100,000 of this debt was incurred after Carmen, on behalf of Gritz, filed suit against Harvestore for wrongful termination of the franchise. Because Gritz was no longer in operation, it is unclear what disposition was made of the goods shipped to Gritz. Carmen has spent the $500,000 "profit" he received from the sale of the dealership; thus, Carmen will not be able to fully indemnify the appellant for any liability he incurs on the 1970 guaranty.

Gritz' outstanding end-of-the-month balances to Harvestore during the relevant period were:

| | | |
|---|---|---|
| December | 1980 | $372,739 |
| January | 1981 | 356,909 |
| February | 1981 | 317,419 |
| March | 1981 | 448,429 |
| April | 1981 | 386,422 |
| May | 1981 | 542,379 |
| June | 1981 | 345,860 |
| July | 1981 | 332,778 |
| August | 1981 | 337,481 |
| September | 1981 | 339,683 |
| October | 1981 | 341,958 [5] |
| November | 1981 | 344,159 |
| December | 1981 | 368,957 |

At trial, the only contested issue was the validity of the appellant's defenses. The appellant first claimed that he was discharged from his obligations under the guaranty because of material changes in circumstances that substantially increased his risk of loss. This was so whether he was considered to be a compensated or uncompensated guarantor. The appellant next claimed that Harvestore was estopped from enforcing the 1970 guaranty because Harvestore improperly continued to extend credit after it had decided to terminate the franchise and because Harvestore's attorney had concurred in the view that the 1970 guaranty was unenforceable and had failed to send appellant's attorney a copy of the 1970 guaranty. Finally, the appellant claimed that Harvestore had waived its right to enforce the guaranty because it

---

3. The total amount of Gritz' outstanding debt to Harvestore when shipments to Gritz were finally terminated in September 1981 was $339,683. The difference between this figure and the amount for which the appellant was ultimately held liable apparently reflects the value of goods shipped on another account ($4,820.40), plus interest. *See infra* note 4.

4. Of the $194,718.07 worth of goods shipped after June 30, 1981, $129,591.12 of that amount was shipped after July 23, 1981. This figure appears to conflict with an answer given by Gritz to an interrogatory posed by Harvestore. Gritz responded that the total amount in dollars of goods or services that Gritz purchased from Harvestore from July 1981 to September 1981

was $4,820.40. A separate judgment was entered against Carmen and Gritz for $4,962.14, plus interest at twelve percent per year; Jim was never held liable for this amount. Thus this was evidently a separate account.

Other evidence in the record suggests that Harvestore shipped no goods to Gritz after the actual termination date, other than the $4,962.14 in goods for which the appellant was not held liable.

5. The end-of-the-month balances from October 1981 to and including December 1981 apparently represent old debt, plus new interest, because no new goods were shipped after September 1981.

had discontinued to rely on the appellant's guaranty.

After the appellant had presented all of his evidence, Harvestore requested that the court rule that the defenses presented were insufficient as a matter of law. The district judge ruled that the appellant was a compensated guarantor and, as such, under Wisconsin law, *see Vandervest v. Kauffman Pizza, Inc.*, 60 Wis.2d 230, 208 N.W.2d 428 (1973), he could not assert the defense of material changes in circumstances. The district judge further ruled that even if *Vandervest* did not control, the appellant had not presented sufficient evidence to show that his risk of loss had been substantially increased by a material change in the Gritz/Harvestore relationship. Finally, the judge ruled that Harvestore was not estopped from enforcing the 1970 guaranty and it had not waived its right to enforce it. On appeal, the appellant challenges each of these rulings.

## II

■ Appellant first argues that under Wisconsin law he is not a compensated guarantor because he has never been in the business of executing guaranties for a premium.[6] In making this argument, he relies on *Associates Financial Services Co. v. Eisenberg*, 51 Wis.2d 85, 186 N.W.2d 272 (1971), and *Restatement, Security*, § 82 at 228–239 (1941). The *Restatement* appears to adopt the position that only those in the business of executing guaranties for profit are compensated guarantors, and the court in *Associates Financial Services* does cite to the *Restatement* when defining a compensated guarantor. Harvestore appears to concede that *Associates Financial Services* adopted the *Restatement* rule, but argues that the case should be discarded as

a relic. A close reading of *Associates Financial Services* reveals, however, that in Wisconsin compensated guarantors are not only those that execute guaranties for profit. In *Associates Financial Services*, the court stated

> Eisenberg argues he was a gratuitous surety.... We have held a surety contract when ambiguous should be construed in favor of the surety unless the surety executes the contract for a premium or *other consideration....* [citations omitted] Eisenberg is not in the guaranty business, has received no premium and, so far as the record shows, received no *"other consideration"* within the meaning of this rule.

*Id.* at 89–90, 186 N.W.2d at 274 (emphasis added). Thus, in Wisconsin, a guarantor who receives consideration for executing the guaranty is not a gratuitous guarantor even though he is not in the business of executing guaranties. *See also Vandervest*, 60 Wis.2d at 246, 208 N.W.2d at 436; 10 S. Williston, *A Treatise on the Law of Contracts* § 1213 at 707 (3d ed. 1967). Even if the court in *Associates Financial Services* did adopt the *Restatement* rule, subsequent decisions of the Wisconsin Supreme Court have, at least implicitly, modified the rule, *see Vandervest*, so that any guarantor who receives consideration for executing the guaranty is considered to be compensated.

In the instant case, the district judge found that the appellant was a compensated guarantor because, but for the guaranty, Harvestore would never have granted the dealership to the brothers and because the appellant derived a substantial pecuniary benefit from the operation of the dealership. This is a correct finding under Wisconsin law. *See Vandervest*, 60 Wis.2d at 246, 208 N.W.2d at 436 (guarantors of

---

**6.** Even though we hold that under Wisconsin law a compensated guarantor may be discharged by a material change in the creditor/principal relationship, *see infra* at 1229–1231, we still must decide whether appellant is a compensated guarantor. Uncompensated guar-

antors are treated more favorably than compensated guarantors; any change in the creditor/principal relationship discharges an uncompensated guarantor. A compensated guarantor is only discharged by a material change that adversely affects him.

rental payments were compensated by the fact that without their guaranties the building in which they operated a pizza parlor would not have been built and the land on which the building was erected would not have been leased to the guarantors' pizza parlor franchise). *See also United States Shoe Corp. v. Hackett,* 601 F.Supp. 531, 532, 535–36 (E.D.Wis.1985).

### III

■ Appellant next argues that under Wisconsin law, even though he may be a compensated guarantor, he may assert the defense of material changes in circumstances. We agree. Relying on *Vandervest,* the district judge ruled that in Wisconsin a compensated guarantor can never be discharged from his guaranty even when there is a material change in the creditor/principal relationship that significantly increases the guarantor's risk of having to satisfy the principal's debts. Although there is language in *Vandervest* that supports this view, we do not believe that the Wisconsin Supreme Court intended to so drastically change the law of suretyship. In *Vandervest,* the court stated:

> Because ... [the guarantors were compensated] they cannot claim the benefit of a rule that allows a gratuitous surety or uncompensated guarantor to escape his original liability by a change in terms of the principal's obligation.

*Id.* 60 Wis.2d at 246, 208 N.W.2d at 436. In our view, the court was merely restating the traditional rule that a compensated guarantor is not discharged unless there was a material alteration in the terms of the principal's obligation and unless that alteration works to the detriment of the guarantor; an uncompensated guarantor, on the other hand, may be discharged by any alteration in the principal's obligation regardless of whether he is prejudiced by the change.[7]

Our interpretation of *Vandervest* is supported by the following considerations. First, the cases on which the *Vandervest* court relied in stating this rule, *see Nichols,* 48 Wis. 110, 4 N.W. 137 (1880); *Sage v. Strong,* 40 Wis. 575 (1876), merely restated the "elementary [and] ... universal" rule "that a surety for the performance of a contract or obligation is discharged if such contract or obligation be materially changed without his consent." *Sage,* 40 Wis. at 577; *accord Nichols,* 48 Wis. at 112, 4 N.W. at 138. In those cases, the courts did not discuss any differences between compensated and uncompensated guarantors. Second, in *Vandervest,* it appeared that the change in the principal's obligation was not prejudicial to the guarantors. The bank to whom the lessor had assigned the guaranteed lease increased the monthly rental payments from $1,300 to $1,348.59 per month, and the lessor only sought to enforce the original $1,300 per month payment against the guarantors. Third, it is well recognized that the Wisconsin courts take the majority view that "a material alteration in the contract between the creditor and the principal made after the execution of the guaranty contract and without the consent of the guarantor discharges the guarantor." *Federal Deposit*

---

7. *See Restatement, Security* § 128 at 340–41 (1941):

Where, without the surety's consent, the principal and the creditor modify their contract otherwise than by extension of time of payment:
(a) the surety, other than a compensated surety, is discharged unless the modification is of a sort that can only be beneficial to the surety, and
(b) the compensated surety is
(i) discharged if the modification materially increases his risk, and

(ii) not discharged if the risk is not materially increased, but his obligation is reduced to the extent of loss due to the modification.
*Id.* (emphasis added) 10 S. Williston, *A Treatise on the Law of Contracts,* §§ 1239, 1240 at 763–69 (3d ed. 1967); 38 Am.Jur. § 81 at 1088 (1968) (It is the law in every jurisdiction "that a material alteration in the principal contract, when that alteration is made after the execution of the guaranty contract and without the consent of the guarantor, discharges the guarantor if the material alteration injures the interest of the guarantor.").

*Ins. Corp. v. Manion,* 712 F.2d 295, 297 (7th Cir.1983); *accord Lakeshore Commercial Finance Corp. v. Drobac,* 107 Wis.2d 445, 447, 319 N.W.2d 839, 840 (1982); *Baumgarten v. Bubolz,* 104 Wis.2d 210, 215, 311 N.W.2d 230, 232 (Wis.App.1981) (as a general rule, any change in agreement between principal and creditor that results in larger responsibilities or liabilities on the part of the principal, made without consent of the guarantor, acts as a discharge of the guarantor); *Morley-Murphy Co. v. Van Vreede,* 223 Wis. 1, 7, 269 N.W. 664, 666 (1936). Although in none of these cases did the court discuss the differences between compensated and uncompensated guarantors, each case noted that Wisconsin follows the general rule regarding when a guarantor may be discharged. In *Manion, Lakeshore Commercial Finance,* and *Baumgarten* (all post-*Vandervest* ), the court also cited to 10 S. Williston, *supra,* §§ 1239, 1240 at 763–69, in which Professor Williston discusses when compensated guarantors may be discharged. Presumably had the *Vandervest* court undertaken to effectuate a drastic change in Wisconsin law, it would have discussed the issue in more detail. In addition, the courts in *Manion, Lakeshore Commercial Finance,* and *Baumgarten* would have recognized this change as well. *See also Hackett,* 601 F.Supp. at 535–36; *John Deere Co. v. Babcock,* 89 Wis.2d 672, 675–76, 278 N.W.2d 885, 886 (1979).

Finally, if we construed *Vandervest* in the manner in which Harvestore has suggested, this would mean that a compensated guarantor can never be discharged from his guaranty no matter how drastic the change in circumstances and no matter how much the guarantor's risk may have increased. Although Harvestore is correct that, as a matter of policy, uncompensated guarantors should be treated more leniently than compensated guarantors, this does not compel the adoption of a rule that always denies any relief to compensated guarantors and makes them absolute insurers of the principal's obligation. To adopt such a rule, in the absence of a clearer statement from the Wisconsin Supreme Court, would drastically increase the price of sureties because a compensated guarantor could never estimate his potential liability. Moreover, the traditional rule discussed *supra* at 1229–1231, and note 7 adequately promotes the policy of differentiating between uncompensated and compensated guarantors. Thus we believe that under Wisconsin law a compensated guarantor may assert the defense of material changes in the creditor/principal relationship.

## IV

Appellant points to the following material changes in circumstances that he believes discharge his obligations under the guaranty: (a) the 1974 exchange in franchise territory that allegedly reduced Gritz' market potential by three to four percent; (b) Carmen's involuntary termination of the appellant as general manager, officer, director, and employee of Gritz; (c) the involuntary dilution of the appellant's shareholdings in Gritz; (d) the sale of two-thirds of the dealership and the termination of the remaining one-third in June 1981; and (e) Harvestore's extension of credit to Gritz following its notice of and actual termination of the franchise in 1981.

In order to determine whether any of these "changed circumstances" might discharge the appellant's obligations under the 1970 guaranty, we must first consider the express terms of the guaranty. *Hackett,* 601 F.Supp. at 533–34. *See, e.g., U.S. Suzuki Motor Corp. v. Johnson,* 673 S.W.2d 105, 107 (Mo.App.1984). The guaranty provides that it is "absolute and unconditional as to amount and time" and that the guarantor is to be responsible for "payment in full of *all* monies due and owing ... [Harvestore] by Gritz Harvestore, Inc. ... (the "Purchaser") ... covering *any* [of Gritz'] indebtedness ... [to Harvestore created on] open account." (emphasis added) The guaranty provides

**1232**

that it is to be in full force until revoked by written notice from the guarantor. This type of guaranty is commonly known as a "continuing guaranty" because the parties intend that the guaranty will continue for an indefinite time unless it is expressly revoked or terminated by operation of law. *Hackett,* 601 F.Supp. at 534.

■ The district judge correctly ruled that the first three facts identified by appellant are insufficient as a matter of law to establish the defense of material changes in circumstances. That defense only applies if there are material changes in the creditor/principal relationship or agreement that increases the guarantor's assumed risk. *See, e.g., Manion,* 712 F.2d at 298 (applying Wisconsin law and holding that extension of terms of payment operated to discharge guarantor who in writing specifically revokes guaranty insofar as it applies to new extensions of credit); *Lakeshore Commercial Finance,* 107 Wis.2d at 459, 319 N.W.2d at 846 (guarantor discharged when maturity date on note was reduced by six months); *Morley-Murphy Co.,* 223 Wis. at 6–7, 269 N.W. at 666 (guarantor discharged where added date of payment to promissory note); *Chandler Lumber Co. v. Radke,* 136 Wis. 495, 499–500, 118 N.W. 185, 186 (1908) (guarantor discharged where method of payment changed from FOB to due at delivery). *See also Restatement, Security,* § 128 at 341–351 and examples discussed therein. The first three material changes about which appellant complains are changes in the guarantor/principal relationship and hence cannot affect appellant's liability on the guaranty. This is so even if Harvestore (the creditor) was aware and approved of the changes. *See, e.g., Missouri Farmers Ass'n, Inc. v. Coleman,* 676 S.W.2d 855, 859 (Mo.App.1984) (creditor may enforce guaranties even though guarantors are now divorced); *Pascoe Steel Corp. v. Shannon,* 224 Va. 530, 298 S.E.2d 97, 99 (1982) (creditor may enforce guaranty even though guarantor, a former bank official, had severed his relationship with

the corporation); *Ivy v. Grenada Bank,* 401 So.2d 1302, 1303 (Miss.1981) (guaranty not extinguished because guarantor had disposed of his stock in debtor-corporation or because he did not closely read the guaranty or receive a copy of it).

Moreover, even if these facts did constitute legally sufficient material changes, appellant has failed to explain how these changes *per se* significantly increased the probability that appellant would be required to answer for Gritz' debts. The mere fact that appellant had been squeezed out of the dealership or that the dealership's market potential might have been reduced by three to four percent does not compel the conclusion that the risk that the dealership would default on its debts had increased.

■ We also agree with the district judge that the appellant did not introduce sufficient evidence to prove that termination of the dealership in 1981 and Harvestore's extension of credit from January 1981 until the actual termination of the dealership increased appellant's risk of being called on to repay the debt. The district judge properly found that the extension of credit after January 1981 until actual termination decreased appellant's risk because it made it possible that the dealership would be sold as a going concern. In addition, the mere fact of termination of the dealership is not generally a legally sufficient material change that can discharge the appellant. *See Essex Int'l, Inc. v. Clamage,* 440 F.2d 547, 550 (7th Cir. 1971) (applying Illinois law) (mere change in nature or structure of business does not *per se* discharge guarantor). As the district judge found, the guaranty is required precisely for this reason—*i.e.,* the dealership will be terminated and perhaps unable to pay its debts.

■ The most difficult issue raised by this appeal is whether the extension of credit after the dealership was terminated and sold to a third party constitutes such a

material change in circumstances that the appellant is discharged from any or all liability on the guaranty. We do not reach the issue, however, because we find that the guaranty by its very terms expired when the dealership was terminated. In our view, this case is analogous to those in which the guarantor has been discharged from liability for debts incurred by the principal after the principal underwent a substantial change in its business structure. *See generally* Annot., 69 A.L.R.3d 567 (1976) and (Supp.1984), and cases cited therein. In many of those cases, the courts have held that when the principal undergoes a change of name or location, incorporates, transfers its assets, is taken over, is dissolved or ceases to do business, the guarantor may be discharged from liability for debts incurred by the "new" principal if the change results in an increased risk to the guarantor. The reasoning is that the change has the effect "of making a contract on which the guarantor or surety never intended to become liable." *Id.* at 571. *Accord Hackett*, 601 F.Supp. at 534.

We think that reasoning is applicable to this case. The parties do not dispute that the guaranty was executed in exchange for Harvestore's granting the dealership. Indeed, Harvestore insists that this is the case. The personal guaranty itself shows that the appellant is to be liable for any debts of Gritz Harvestore, Inc. Although the guaranty does not explicitly state that the appellant is only to be liable for the debts of Gritz Harvestore, Inc. *as dealership*, we think such a term can fairly be inferred because Gritz was only formed and incorporated after the brothers had

submitted an application with accompanying personal guaranties for the dealership. In our view, there is no doubt that the parties contemplated that the guaranties were to protect Harvestore for debts incurred by the *dealership*, not those incurred independently by Carmen operating the franchise as an empty shell. *See John Deere Co.*, 89 Wis.2d at 676–76a, 278 N.W.2d at 886 (retail dealership by its very nature contemplates continuous shipments of inventory to the *dealership* from the supplier). And nothing in the guaranty states explicitly or even suggests that the appellant was to be held liable for debts incurred after the dealership was terminated. True, the guaranty speaks in terms of the guarantor's liability for "any or all" of the purchaser's debts, but we think that those are only "any and all" of the *dealership*-purchaser's debts. *See International Paper Co. v. Grossman*, 541 F.Supp. 1236, 1240–41 (N.D.Ill.1982), *aff'd mem.*, 725 F.2d 687 (7th Cir.1983) (guarantor's liability extended solely to pre-merger corporation where guaranty clearly identified pre-merger corporation as "purchaser"). *See also U.S. Suzuki Motor Corp.*, 673 S.W.2d at 107–08 (although guaranty provides that guarantor is liable for "any indebtedness of [the debtor to the creditor]," guarantor may be discharged for debts incurred by purchaser to third parties that are subsequently assigned to creditor if evidence shows that parties did not, upon execution of guaranty, intend guaranty to cover assigned debts).

Thus we hold that the guaranty, although absolute, was contingent upon the credit being extended during the existence of the dealership.[8] We, therefore, remand this

---

**8.** It can be argued that because the appellant was aware that his brother was attempting to sell the franchise, he should be held liable because he failed to revoke the guaranty. *See Baumgarten,* 104 Wis.2d at 215, 217, 311 N.W.2d at 233 (guarantor waived right to object to change in obligation because he was aware of change and failed to protect himself against it). *See generally* Annot., 69 A.L.R.3d 567 and cases cited therein. But in most instances in which the guarantor's knowledge of or participation in the change estopped it from presenting the legal

defense of changed circumstances, the courts reasoned that the guarantor, at least implicitly, had consented to the extension of credit to the new entity. In this case, there is not the slightest indication that the appellant consented to the extension of credit to his brother, with whom he had just settled a bitter and protracted litigation over the dealership, in the name of the dealership.

There is also some authority for the proposition that it is the guarantor's duty to revoke the guaranty to protect himself from a creditor's

case to the district judge to modify the judgment entered against appellant to include only those debts incurred before the dealership was terminated. She will probably need to take further evidence because the record is unclear regarding the exact termination date of the franchise and how much credit Harvestore extended to Gritz after that date, *see* discussion *supra* at 1227–1228.

## V

Appellant next argues that Harvestore is estopped from enforcing the 1970 guaranty or, in the alternative, that it waived its rights to enforce the guaranty. Even though we have already held that the appellant is discharged from liability at least for any credit extended after the dealership was terminated, we consider these two arguments because if appellant is correct he would be discharged for the entire debt and there would be no need to remand to the district judge. We hold that the district judge properly decided that Harvestore did not waive its rights to enforce the guaranty to collect for debts incurred by Gritz and that it is not equitably estopped from enforcing those rights.

Appellant claims that Harvestore is equitably estopped from enforcing the guaranty because it abandoned its own credit procedures and because Sullivan acquiesced in Steiner's remarks regarding the unenforceability of the guaranty. To establish estoppel the appellant must show that Harvestore or its agent, Sullivan, acted or made a promise with the intention or the reasonable expectation that the appellant or his

agent, Steiner, would rely on the act or promise, that the reliance was reasonable, and that appellant was injured by the reliance. *Prize Steak Products, Inc. v. Bally's Tom Foolery, Inc.*, 717 F.2d 367, 370 (7th Cir.1983) (citing *Wamser v. Bamberger*, 101 Wis.2d 637, 642, 305 N.W.2d 158, 160 (Wis.App.1981)). "Proof of equitable estoppel must be clear, satisfactory and convincing, and is not to rest on mere inference and conjecture." *Prize Steak Products, Inc.*, 717 F.2d at 370. This court can also determine, as a question of law, whether the facts as proven constitute estoppel. *Id.*

With respect to the claim that Harvestore abandoned its own credit procedures, the district judge properly held that the appellant introduced no evidence, much less convincing evidence, that in signing the guaranty he relied upon any acts, promises, or misrepresentations by Harvestore regarding its own credit procedures. Rather, the appellant "asks us to infer reliance from the mere fact that a guaranty was made." *Prize Steak Products, Inc.*, 717 F.2d at 370. This court has previously held that "some additional facts must be clearly proven to create a strong inference of actual reliance." *Id.* That has not been done in this case. *See also United States v. Bachman*, 601 F.Supp. 1537, 1542–43 (E.D. Wis.1985).

With respect to the claim that Sullivan's acts estop Harvestore, even if we assume that Sullivan intentionally agreed with Steiner and failed to send Steiner a copy of the guaranty in order to lull appellant into believing that Harvestore no longer considered the guaranty enforceable, the ele-

imprudent extensions of credit to the principal. *See, e.g., Hoffman v. Franklin County Mercantile Bank*, 666 S.W.2d 446, 450 (Mo.App.1984) (guarantor has no cause of action against bank for liability incurred as a result of bank's extension of credit to principal after bank knew principal had become insolvent). And, as in *Hoffman*, there is simply no excuse in this case for the guarantor's failure to revoke the guaranty prior to the creditor's "negligent" extension of credit. But nothing in the guaranty in *Hoffman* suggested that it would be revoked by its own terms when the debtor became insolvent. By con-

trast, in this case, the guaranty was contingent upon the continued existence of the dealership. *Cf. International Paper Co. v. Grossman*, 541 F.Supp. 1236, 1238–39, 1241 (N.D.Ill.1982) (guarantor discharged from post-merger corporation's debts even though he was aware of and consented to the merger because the guaranty by its own terms ceased to be effective after the merger). Thus to avoid liability for the post-termination debts, appellant was not required to revoke the guaranty; he was entitled to assume that the guaranty by its own terms would cease to be effective.

ments of equitable estoppel have not been met here. Steiner's reliance on Sullivan's "off-hand, tentative" remarks was not reasonable and does not justify his inexcusable failure to follow up on his request for a copy of the guaranty or his failure to revoke the guaranty. A reasonably prudent lawyer who wanted to ensure that his client would have no further liability under a guaranty would have written a letter to the creditor revoking the guaranty, even if the lawyer had never seen a copy of the guaranty. This is particularly true given the fact that by 1977, Steiner had been practicing law for almost twenty years and that in 1977 Steiner had consulted his firm's litigation department regarding the difference between revoking a guaranty and taking the view that it was unenforceable.

Finally, the appellant claims that Harvestore waived its rights to enforce the guaranty because the evidence shows that Harvestore no longer relied on the guaranty. In particular, appellant relies on the facts that Harvestore requested a new guaranty in 1977 and that Harvestore did not do any further credit checks on appellant after 1977. We agree with the district judge that these facts do not demonstrate that Harvestore waived any of its rights. *See Essex Int'l, Inc.*, 440 F.2d at 551 (creditor's attempt to have guarantor execute new guaranty does not show without more that the creditor waived his rights to enforce the guaranty); *Bachman*, 601 F.Supp. at 1542.

The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion. Circuit Rule 18 shall not apply.