The UNITED STATES SHOE CORPORATION, Plaintiff-Appellant,

v.

Patrick A. HACKETT and Rosemary H. Hackett, Defendants-Appellees.

No. 85–2804.

United States Court of Appeals, Seventh Circuit.

Argued May 9, 1986.

Decided June 13, 1986.

Rehearing and Rehearing En Banc Denied July 7, 1986.

Gary P. Lantzy, Kohner, Mann & Kailas, Milwaukee, Wis., for plaintiff-appellant.

Michael A. Bowen, Foley Lardner, Milwaukee, Wis., for defendants-appellees.

Before POSNER and EASTERBROOK, Circuit Judges, and CAMPBELL, Senior District Judge.*

EASTERBROOK, Circuit Judge.

After Graebel's, Inc., became bankrupt in 1984, it owed $84,788 to The United States Shoe Corp. Shoe filed this diversity action to recover on a guaranty by Patrick and Rosemary Hackett, who are the officers, directors, and stockholders of Graebel's, Inc. The difficulty is that the guaranty, which the Hacketts signed in 1973,

---

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

covers only credit extended to "HACKETT ENTERPRISES, INC., a Wisconsin Corporation, d/b/a GRAEBEL'S". In 1973 Hackett Enterprises and Graebel's, Inc., were separate corporations; they and two others (Mequon Shoe Corp. and Graebel's Fond du Lac Shoe Corporation, Inc.), all owned by the Hacketts, merged in 1976. Graebel's, Inc., was the surviving corporation, and it made all subsequent purchases in its own name. The district court granted summary judgment to the Hacketts, 601 F.Supp. 531 (E.D.Wisc.1985), concluding that the merger increased the risk of the guaranty, which discharged the Hacketts. We conclude that the Hacketts may not use new risk for which they were responsible to escape their guaranty, and that the grant of summary judgment was improvident.

The Hacketts and their corporations operated a chain of shoe stores in Milwaukee doing business under the trade name Graebel's. The Hacketts also sold shoes under other names, such as King Canvas; the Hacketts' firms ran occasional sales, such as one in a tent at the Experimental Aircraft Association Fly-In in Oshkosh, Wisconsin. The Graebel's name was used for the established stores. Between 1973 and 1976 Hackett Enterprises purchased shoes for all of the Hacketts' ventures. Hackett Enterprises would place the orders and direct delivery to the address where the shoes would be sold. Shoe would send the bill to Hackett Enterprises. In 1974, however, Mequon Shoe Corp. apparently purchased some shoes directly, and Shoe obtained a security interest in Mequon's inventory. Rosemary Hackett's affidavit, which describes the sale to Mequon, does not say how many of the purchases were made by Hackett Enterprises and how many by Mequon, although it says that "most" were made by Hackett Enterprises.

■ The district court thought that "the risk inherent in guarantying the obligations of 'Hackett Enterprises d/b/a Graebels' [sic] is nowhere near as great as that in guarantying the combined obligations of the four corporations merged into a new entity entitled 'Graebels [sic], Inc.'" (601

F.Supp. at 536). This view depended in part on the court's conclusion that "d/b/a GRAEBEL'S" is a term of limitation; we discuss this below. The proposition that a significant increase in risk discharges a guaranty is established in Wisconsin. *Sage v. Strong*, 40 Wis. 575 (1876). See *Gritz Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.*, 769 F.2d 1225, 1230–34 (7th Cir.1985) (summarizing and applying Wisconsin law on this question). But no one can tell from the materials in the record whether there was a significant increase in risk, let alone whether the old risk was "nowhere near as great". Until 1977 Hackett Enterprises bought most of the shoes for all of the Hacketts' firms. We do not know how many shoes Mequon purchased directly; we do not know how many shoes Hackett Enterprises purchased for the use of outlets not doing business under the Graebel's trade name. For all we can tell 95% of all the purchases for the Hackett family corporations were made by Hackett Enterprises for the benefit of outlets doing business as Graebel's. The parties agreed at oral argument that critical records have been lost, so that precise measurement is impossible, but the record does not contain even a guess about the proportions. There is therefore no support for the district court's conclusion that the merger must have increased the risk a substantial amount.

A more fundamental point makes a guess on this score unnecessary, however. The principle that a big increase in risk discharges the guarantor is an implication of the fact that a guaranty is a commercial contract. The guarantor takes a risk in exchange for a benefit (here, the indirect benefit of appreciation in the value of the family's corporations). Unless the guarantor can estimate the size of the risk, he cannot tell whether the return is worthwhile. When events beyond the guarantor's control dramatically increase the risk, the assumptions on which the contract was founded are undercut. Usually a change in the terms of trade does not discharge a contract; an increase in the market price of coal does not relieve a seller of making

deliveries contracted for at a lower price; the risk of a change in price influences the price fixed in the contract, and the contract apportions risk. But most guarantees allow the guarantor to walk away on notice. This one did; the Hacketts were free to revoke the guaranty at any time (although this would not terminate liability for goods already delivered). The principle that a substantial increase in risk avoids the guaranty rests on the assumption that guarantors would not ordinarily tolerate a big increase in the risk they face without seeking something in return. When there is such an increase, outside the guarantors' knowledge, courts treat the guaranty as if the right to revoke had been timely exercised. In *Gritz*, for example, the business was taken over by people hostile to the guarantor, and its franchisor then terminated the business relationship. This combination greatly increased the risk to which the guarantor was exposed, and the guarantor had no say in the increase.

If the party creating the new risk wants the guaranty to continue, it must take the initiative. The guarantor may consent, reaffirming the obligation. Thus a full statement of the rule is that "a material alteration in the contract between the creditor and the principal made after the execution of the guaranty contract and without the consent of the guarantor discharges the guarantor." *FDIC v. Manion,* 712 F.2d 295, 297 (7th Cir.1983); accord, *Lakeshore Commercial Finance Corp. v. Drobac,* 107 Wis.2d 445, 447, 319 N.W.2d 839, 840 (1982); *Morley-Murphy Co. v. Van Vreede,* 223 Wis. 1, 7, 269 N.W. 664, 666 (1936).

A guarantor may consent to the increased risk if he knows of the risk and proceeds heedless of it. Closer to the point, a guarantor may consent to the increased risk by creating it. Suppose in 1973, when the Hacketts signed the guaranty, they had been purchasing half of their requirements through Hackett Enterprises, Inc., and half through Mequon Shoe Corp., and suppose none of Mequon's purchases were subject to the guaranty. If in 1974 they funnelled all purchases through Hackett Enterprises, this would increase their exposure, but it would not discharge the guaranty. Or suppose the Hacketts suddenly applied the trade name Graebel's to all of their outlets, or quintupled the number of Graebel's stores they operated while maintaining separate King Canvas stores. Either would increase the risk; neither would discharge the guaranty, because in each case the Hacketts would know of and control the amount of risk. (The parties do not make anything of the fact that the corporations nominally made the decisions, perhaps because the Hacketts as managers caused them to do so, and the Hacketts as shareholders voted for the merger, so neither shall we.) When a guarantor is responsible for the increased risk, the guaranty remains in effect. It expands with the risk unless the guarantor expressly revokes the instrument. The Hacketts did not revoke their guaranty. The guaranty was designed to induce Shoe to sell its wares on credit to a closely-held family of corporations. Shoe sent no more merchandise than the Hacketts wanted to buy, and by ordering more they cannot avoid their promise to stand behind the corporations' debts.

The Hacketts offer a second excuse, that Hackett Enterprises "ceased to exist" in December 1976 when the four corporations merged. They agreed to stand behind the debts of Hackett Enterprises, not behind the debts of Graebel's, Inc. Corporate law does say that merged firms "cease to exist." Wisconsin has adopted the 1969 version of the American Bar Association's *Model Business Corporation Act.* See Wis.Stat. § 180.67, which specifies the effect of mergers, and § 11.06 of the 1984 version of the *Model Act.* But a merged firm "ceases to exist" only in the sense that it has no separate existence. It is sometimes misleading to talk of a firm as an "it." The corporation is just the legal identity of a complex set of contracts, and these contracts—directly or indirectly between people rather than legal constructs—are what matter. When the firm ceases to have a separate identity, the con-

tracts live on. When Hackett Enterprises merged with Graebel's, Inc., both firms had contractual obligations and contractual entitlements. They owed money to suppliers such as Shoe, and they were owed money in return by customers. These rights and obligations, these contracts, survived the merger. So, too, if Marathon Oil Corp. had advantageous leases when it merged with United States Steel Corp., these leases would have survived the merger. The lessors, or the people with obligations to deliver crude oil to Marathon, could not have said: "Marathon has ceased to exist, so our obligations are at an end." The merger transferred all contracts to the surviving corporation; relations with outsiders went on as if nothing had happened.

Shoe is an outsider to the dealings among the Hacketts' family corporations. Mergers among them do not affect obligations to Shoe, and in particular do not terminate guarantees. See *Cargill, Inc. v. Buis*, 543 F.2d 584, 586–88 (7th Cir.1976), which holds this under Indiana law. There is no reason to think that Wisconsin law is different. The district court relied on *International Paper Co. v. Grossman*, 541 F.Supp. 1236, 1241 (N.D.Ill.1982), *aff'd mem.*, 725 F.2d 687 (7th Cir.1983), which concluded that under New York law a merger extinguishes guarantees of the debts of any of the merged firms. See also *Teledyne Mid-America Corp. v. HOH Corp.*, 486 F.2d 987 (9th Cir.1973). We doubt that this is the law in New York; we are confident that it is not the law in Wisconsin. Cases such as *International Paper* and *Teledyne* deal with mergers that also fundamentally altered the risk of the guaranty; they do not hold that a merger by itself terminates a guaranty.

Imagine a simple merger. Hackett Enterprises forms a subsidiary and merges itself into the subsidiary, which as the surviving corporation renames itself Hackett Enterprises, Inc. Or imagine that Hackett Enterprises and Mequon merge, with Hackett the survivor. To outsiders such as Shoe all is as before. Shoe continues to deal with Hackett Enterprises. The Hacketts conceded at oral argument that in ei-

ther of these cases the guaranty would continue; they do not dispute the rule that changes in the name, line of business, or corporate status (such as corporation versus partnership) of the obligor do not affect a guaranty. See *Gritz Harvestore*, 769 F.2d at 1231–32, summarizing Wisconsin law. The same principle would apply if Hackett Enterprises had changed its name to Graebel's, Inc.; the change of name, with no change of substance, would not have obliterated the guaranty on continuing sales, even though Shoe now was dealing with a different name. Instead of one of these simple, but irrelevant, restructurings, the four corporations might have merged and designated Hackett Enterprises as the survivor. Again Shoe would have supposed that nothing had happened. (The parties agree that Shoe never received notice of the actual merger.) The guaranty of sales to Hackett Enterprises would have had the same force as before. If Hackett Enterprises as surviving corporation changes its name to Graebel's, Inc., nothing of substance occurs, so again the guaranty endures. Having established that the Hacketts remain liable if Hackett Enterprises is the survivor, and that the change of name does not matter, it follows that the Hacketts remain liable if Graebel's is the survivor. The designation of the "survivor" in a corporate merger has nothing to do with relations with outsiders. It is a matter of nomenclature and picking the bylaws of the merged corporation; nothing else turns on it.

There is a third possible defense to liability. The guaranty was negotiated as part of a plan to open a new Graebel's store. The Hacketts wished to pay for the inventory over 36 months; Shoe demanded a guaranty in return. The Hacketts say that this purpose shows that the guaranty did not survive the merger, which occurred after the debt incurred to build up the inventory had been paid. The district court said: "This view of the case [that the merger increased the risk of the guaranty] is buttressed by the affidavit of the Hacketts to the effect that the guaranty was meant

to cover the one-shot start up inventory of the new Bayshore store and contemplated pay-off within 36 months." 601 F.Supp. at 536. The guaranty is not so limited, however. It covers debts "which may hereafter be incurred by said Debtor" and "shall continue until expressly revoked by written notice to U.S. Shoe". When a contract explicitly covers a point, Wisconsin does not allow resort to the bargaining history. See *Prudential Ins. Co. v. Miller Brewing Co.*, 789 F.2d 1269, 1274–75 (7th Cir.1986), (collecting Wisconsin cases). Even after retiring the debt incurred in 1973, the Hacketts wanted to purchase shoes, and they incurred substantial new debts. Shoe might have demanded a fresh guaranty had it any reason to believe that the old one was ineffectual. Shoe was entitled to rely on the guaranty as written, not as limited by the Hacketts' interpretation of its original purpose. Objective readings of financial instruments promote commercial transactions.

The Hacketts turn Shoe's "plain meaning" argument around, arguing that because the guaranty does not apply to the successors and assigns of Hackett Enterprises, Inc., it did not survive the merger. As we have explained, however, Graebel's, Inc., is not a "successor" of Hackett Enterprises; it *is* Hackett Enterprises (and three other corporations) with a new shell. Graebel's, Inc., is no more a "successor" than Hackett Enterprises would be its own "successor" had Hackett Enterprises been the nominal survivor, or had Hackett Enterprises purchased the assets of the other three corporations in exchange for Hackett Enterprises stock, and then changed its name to Graebel's, Inc. There are dozens of ways to consolidate corporations, and the choice of devices does not affect contracts with outsiders unless the contracts in question contain clauses authorizing or forbidding specified events. As the official comment to the *Model Act* states: "A merger is not a conveyance or transfer, and does not give rise to claims of reverter or impairment of title based on a prohibited conveyance or transfer." 2 *Model Business Corporation Act Annotated* 1287 (3d

ed. 1985). See also *id.* at 1294–95 (collecting cases). The Hacketts' guaranty allowed reopening on merger, but in a specified manner: the Hacketts had only to give notice of revocation. They did not.

■ We are left with a fourth principal argument, one that stymies summary judgment. The guaranty has a significant ambiguity. The Hacketts agreed to underwrite the debts of "HACKETT ENTERPRISES, INC., a Wisconsin Corporation, d/b/a GRAEBEL'S whose principal address is 7630 [sic] West Capitol Drive, Milwaukee, Wisconsin 53222". All four corporations had 7600 West Capitol Drive for their corporate office. Graebel's is a trade name for some of the Hackett's stores. There are two ways (at least) to read "d/b/a GRAEBEL'S" in the guaranty. One is as a limitation. The Hacketts say that the full designation should be read as if it said: "Hackett Enterprises, Inc., but only when it is buying shoes for resale in a store known as Graebel's". The other reading is as a designation of the whole family of corporations. Then it reads: "Hackett Enterprises, Inc., which is to say the Hackett family business, commonly known as Graebel's".

The district court adopted the former meaning. 601 F.Supp. at 535–36. This draws some support from the history of the guaranty, which was to secure credit for inventory at a store known as Graebel's, and from the fact that in 1974 Shoe sold some shoes directly to Mequon and took a security interest rather than relying on the guaranty (or so Mrs. Hackett's affidavit says). The broader reading of "d/b/a GRAEBEL'S" draws some support from the deposition of A.P. Rastani, the regional credit manager of Shoe who wrote the words into the preprinted guaranty. Rastani testified that in 1973 he knew of only one corporation under the Hacketts' control, Hackett Enterprises, Inc., and meant to designate the entire family enterprise by "d/b/a GRAEBEL'S". Rastani said that Graebel's the trade name and Graebel's, Inc., the corporation, were indistinct in his mind, and that he filled in the blank only as Mr. Hackett suggested. Rastani demon-

strated his treatment of trade and corporate names as one many times over when writing to the Hacketts. For example, a dunning letter dated May 9, 1975, is addressed to:

Mr. Pat Hackett
Hackett Enterprises, Inc.
d/b/a Graebel's, Inc.
7600 W. Capitol Dr.

It is not surprising that a credit manager thought "Graebel's" and "Graebel's, Inc." were the same thing. If Rastani correctly remembers how "d/b/a GRAEBEL'S" came to be, and what he knew in 1973, then the designation expands the scope of the guaranty at least to the Hacketts' whole shoe business. (We do not know whether the Hacketts had another line of business.) Shoe is entitled to recover the full $84,788 debt. If "d/b/a GRAEBEL'S" is a limitation, however, then the guaranty covers only shoes that were sold in Graebel's stores. The district court would need to determine what percentage of shoes these were and to award a reduced judgment accordingly. The Hacketts assume that if "d/b/a GRAEBEL'S" is a limitation, they are not liable for any of the debt of Graebel's, Inc. Liability is not an all-or-nothing proposition, however; the Hacketts should be liable according to the terms of the guaranty, and if the terms cover a portion of the sales, the Hacketts must make good that portion.

The drawing of inferences from the bargaining history is not usually appropriate for summary judgment. The district court should not have adopted the Hacketts' position on this subject without explaining why Shoe's position is not plausible. When passing on a motion for summary judgment, the court must draw any reasonable inferences from the facts in favor of the party opposing the motion. *Caldwell v. Miller*, 790 F.2d 589, 596 (7th Cir.1986). The record as it stands contains a genuine dispute that requires a trial. The parties should be permitted to offer additional evidence on the point. Perhaps something will dispel the dispute, leaving nothing for trial. See *May v. Evansville-Vanderburgh School Corp.*, 787 F.2d 1105, 1115–18 (7th Cir.1986). But if, after examining such further evidence as the parties have, the district court concludes that the conflicting characterizations and implications remain, the case should proceed to trial. The trial would resolve both the meaning of "d/b/a GRAEBEL'S" and the percentage of sales covered by the guaranty, if the Hacketts' position on this last subject should be sustained.

REVERSED AND REMANDED.