MIDWAY NATIONAL BANK v.
HARRY GUSTAFSON AND OTHERS.

165 N. W. (2d) 218.

November 22, 1968—No. 40736.

*A. L. Janes, Jr.*, for appellants.

*Robert W. Murnane* and *Murnane, Murnane, Battis, deLambert & Conlin*, for respondent.

KNUTSON, CHIEF JUSTICE.

This is an appeal from an order of the district court denying defendants' motion for amended findings or, in the alternative, for a new trial.

The defendants are or have been stockholders or officers of All Star Bowl, Inc., a Minnesota corporation, which became insolvent while indebted to plaintiff bank. Plaintiff now seeks to recover against defendants as guarantors of All Star's indebtedness.

The pertinent facts may be summarized as follows: On August 13, 1959, defendants Harry Gustafson, A. B. Osgood, and R. E. Gorgen each executed an instrument guaranteeing the indebtedness of All Star to plaintiff bank but limiting the amount of their guaranties in specified amounts. The limit of liability for the guaranty of Gustafson was $100,000; the limit for Osgood was $25,000; and the limit for Gorgen

was $25,000. On June 16, 1960, defendants Phillip D. Wolsieffer, Jerry Kopveiler, Ralph S. Purdum, and Theodore H. Stokke signed a similar instrument of guaranty in which their liability was limited to the sum of $35,000. The instruments, so far as material, are about as broad in scope as could be imagined and provide:

"* * * I hereby guarantee the payment at maturity of all promissory notes, certificates of deposit, checks, drafts, acceptances, *overdrafts*, and other indebtedness of whatsoever nature, upon or for which the Debtor is, or may hereafter become, obligated to the Bank, whether as maker, acceptor, drawer, endorser, guarantor, surety, or otherwise.

"This is an absolute and continuing guaranty delivered by me to the Bank at its request.

"I waive notice of acceptance of this guaranty by the Bank as to present and future obligations, indebtedness and liability of the Debtor to the Bank; and I waive presentment, demand, protest, notice of protest, and notice of dishonor as to each and all items constituting the indebtedness hereby guaranteed. *No renewal or extension of the time of payment of any such item shall affect my liability hereunder, whether made before or after written notice of revocation of this guaranty is given.*

"I authorize the Bank to forward any and all collaterals which it may from time to time hold as security for the indebtedness hereby guaranteed to the Debtor for collection and remittance, or for credit. *I agree that no exchange, release or surrender of any such collaterals, and no release or discharge of any party liable thereon, shall affect my liability on this guaranty.*

"This guaranty is not conditioned upon any other person or party signing the same. It shall as to me continue in full force and effect, notwithstanding the death or release of any co-guarantor or co-surety, both as to obligations of the Debtor then existing, and/or thereafter created.

"*I waive all rights or subrogation to any securities and remedies of the Bank until the entire indebtedness* of the Debtor shall have been fully discharged. My liability hereon, however, shall not at any time exceed the sum of —— Dollars, ($——).

"My liability on this guaranty shall remain in full force and effect *until written notice of revocation or written notice of my death shall have been actually received by said Bank, and such notice shall not affect my liability hereunder as to any and all obligations and indebtedness of the Debtor created before the receipt of such notice, and any renewals thereof.* Nothing shall affect my liability or the liability of my heirs, executors, administrators and assigns, on this guaranty, except the receipt of such written notice or the cancellation and surrender of this guaranty by the Bank." (Italics supplied.)

Thereafter All Star became indebted to the bank in various amounts, some of which were repaid. We are interested here only in two notes, one executed by All Star to plaintiff on June 21, 1960, in the sum of $35,000, payable upon demand; the other executed on April 17, 1963, in the sum of $10,000. The $35,000 note was unsecured. The $10,000 note was secured by a factor's lien on stock and equipment.

Apparently All Star was in financial difficulties almost from the beginning. On January 7, 1964, the funds of All Star deposited in plaintiff bank were garnished by another creditor. The bank exercised its statutory right of offset against All Star's indebtedness to it. It applied $7,635.53 against the $10,000 note, thereby liquidating that note, which was then returned to All Star. It applied $1,711.26 to the $35,000 note.

On February 17, 1964, All Star's accounts in the bank were again garnished and the bank again exercised its statutory right of setoff, applying the sum of $6,063.86 to the balance then due on the $35,000 note, leaving a net balance of $24,698.97. Subsequently the bank permitted overdrafts by All Star amounting to $10,740.13 in a payroll account and $4,185.69 in the corporation's regular account.

All Star went into bankruptcy and the bank released the factor's lien held on the $10,000 note, which had already been discharged by payments and offsets. On May 28, 1965, prior to the commencement of this action, the defendants paid plaintiff $18,648.17 which they claimed was the amount due. Plaintiff then brought this action to recover $6,050.80, which it claims is the balance due on the $35,000 note, and overdrafts and interest in addition, making a total indebtedness of $24,740.27 plus interest.

The following additional facts are pertinent to the transactions which concern us here: On April 5, 1962, all the answering defendants sold their shares of stock in All Star to Wolsieffer, who then became sole owner of the corporation. On May 3, 1962, the bank wrote all the guarantors acknowledging the change in stock ownership and stating that it agreed at Wolsieffer's request to a reduction in payments on the $35,000 note from $1,500 per month to $500 per month commencing in October 1962, and that only one $1,500 payment had been made on the note. The letter requested the consent of the guarantors to the reduction and this consent was given. On January 30, 1963, a similar letter was sent to all the guarantors stating that only one $500 payment had been made and that the bank now agreed to payments of $500 per month for one year beginning in February, with negotiations at the end of the year as to payment of the balance. Consent to this arrangement was asked and received. On April 17, 1963, while Wolsieffer was in control of the corporation, the $10,000 note was negotiated and Wolsieffer signed an additional guaranty.

On June 12, 1963, Purdum directed correspondence to plaintiff bank which may be construed as a notice that he would no longer be liable for any indebtedness incurred after that date.

The trial court allowed judgment to be entered against the defendants in the following amounts: Osgood and Gorgen, $25,000 each (the amount specified in their guaranties); Gustafson, Wolsieffer, Purdum, Stokke, and Kopveiler, $27,624.19 each. These amounts included interest to the date of the court's findings and attorneys' fees in the sum of $1,907.

While the brief of appellants contains numerous assignments of error, the legal issues involved may be summarized as follows:

(1) Was plaintiff bank guilty of a breach of duty to the defendant-guarantors in making loans and permitting overdrafts without the knowledge or consent of, or notice to, defendants, in view of the financial condition of All Star?

(2) When the bank wrote to the defendants on May 3, 1962, and January 30, 1963, requesting agreement on the part of the guarantors to its changing the schedule of payments of the note of June 21, 1960, did

it thereby modify the written guaranty as to notice or waiver, or did they create an estoppel against the bank's assertion of waiver?

(3) Was the application of the deposits in the bank by way of setoff after garnishment legal and proper?

(4) Was the release of security by the bank after institution of bankruptcy proceedings valid?

(5) Were the overdrafts allowed by the bank within the terms of the instrument of guaranty?

(6) Was it proper to allow attorneys' fees?

At the outset it is evident that the instruments executed by defendants to guarantee the payment of All Star's obligations were about as inclusive of every kind of indebtedness of All Star as they could be. Defendants by their guaranties bargained away practically every right which they now advance as a defense to this action. In the case of Watkins Products, Inc. v. Butterfield, 274 Minn. 378, 380, 144 N. W. (2d) 56, 58, we quoted with approval the following comments of the trial judge's memorandum:

"When two competent parties who can readily read and write, sign a guaranty agreement and the plaintiff on the basis of the guaranty extends credit to the other defendant, there is nothing left for a Court to do but to find a judgment against such guarantors. * * * People who sign documents which are plainly written must expect to be held liable thereon. Otherwise written documents would be entirely worthless and chaos would prevail in our business relations."

Following that case the same result ensued in First Nat. Bank v. International Machines Corp. 279 Minn. 188, 193, 156 N. W. (2d) 86, 88. There we said:

"* * * [A]ppellants were knowledgeable businessmen who understood the nature of the obligation which they assumed. As shareholders and directors of the corporation, it may be assumed that they benefited directly from the loan. It cannot be denied that they knew they were to be held responsible in accordance with the terms of the instruments which they signed."

What we said in those cases is applicable here. All the defendants were experienced businessmen. There is nothing in the record to establish bad faith on the part of the bank. All it did was to rely upon the plain language of the instruments defendants had executed.

■ While it is true that a creditor owes a surety the obligation of acting in good faith, as urged by appellants, the creditor is not obliged to look after the interests of the surety; ordinarily, it is up to the surety to see to it that the principal performs his duty. 18 Dunnell, Dig. (3 ed.) § 9093. That is especially true where, as here, liability of the guarantors is limited to the amount they chose to risk and they have a right to terminate all future liability at any time they see fit to do so. Under the terms of this guaranty we see no need to discuss appellants' contention that they are relieved of liability because the bank did not notify them of the obligations of All Star from time to time.

■ Nor are we persuaded that defendants were relieved of liability when the bank asked for their agreement to change the manner of payment of the note of June 21, 1960. In the first place, the guaranty instruments themselves specifically provide:

"* * * No renewal or extension of the time of payment of any such item shall affect my liability hereunder, whether made before or after written notice of revocation of this guaranty is given."

Furthermore, the note remained a demand note, and the agreement of the defendants as to manner of payment was not required at all. If anything, the defendants received something they were not entitled to When the bank sought their agreement to a change in the manner of payment they were apprised of the fact—if they did not already know it—that All Star was having difficulty in meeting its obligation. They could at that time have terminated any future liability had they chosen to do so. We fail to see how, under these circumstances, the bank can or should be estopped from demanding payment according to the terms of the agreement.

■ Appellants contend that when the bank, upon being garnished by a creditor of All Star, offset the money in its hands against All Star's indebtedness to it, it was obliged to apply the offset against the oldest

debt—that is, the unsecured $35,000 note rather than the later note for $10,000, for which it had other security—thus preserving the security for the guarantors. While this case does not present the ordinary case of payment by a principal to a creditor under surety law, even if the same rule applies here, appellants cannot prevail. The rule appellants urge us to apply has application only when a debtor or creditor directs no application of the payment. If a debtor directs application of any payment made on his indebtedness, or if the creditor makes application, such action governs. If neither directs application, then under the law the rule appellants seek to invoke would come into play. 18 Dunnell, Dig. (3 ed.) § 9092; Radichel v. Federal Surety Co. 170 Minn. 92, 212 N. W. 171. There is an exception to this rule in that if there are equities in favor of a surety the payments will be applied so as not to prejudice the surety. Under the circumstances of this case, the bank properly applied the setoffs to the $10,000 note. Return of the note to the debtor was evidence of the bank's election to make such application. By their own agreement defendants had no right to complain of the release of the security for the $10,000 note.

Inasmuch as we hold that the bank properly applied the setoffs, this disposes of the claim that it improperly released the additional security for the $10,000 note after All Star was declared bankrupt. The note having been discharged, the security would go with it, and the bank no longer had a right to retain the security.

■ Appellants next claim that they were not liable on the $10,000 note, which was executed after Wolsieffer became the sole owner of the corporation, because they had no notice or knowledge of it, nor did they consent to it. Here again they urge us to decide this issue directly contrary to their own agreement which provides, among other things—

"I waive notice of acceptance of this guaranty by the Bank as to present and future obligations, indebtedness and liability of the Debtor to the Bank; and I waive presentment, demand, protest, notice of protest, and notice of dishonor as to each and all items constituting the indebtedness hereby guaranteed."

Under this instrument the bank was not obligated to notify the guarantors

of the debts of All Star. They assumed absolute liability for any such debts up to the amount limited by their agreements. The very purpose of the agreements was to guarantee payment of all indebtedness of All Star so long as no retraction was made by the guarantors, and the obligation was a continuing one.

■ Finally, appellants contend that they were not liable for the overdrafts because the amounts were unreasonable and not within the contemplation of the parties. Here again the instruments themselves expressly cover overdrafts among other types of indebtedness All Star might incur. The cases of Lehigh Coal & Iron Co. v. Scallen, 61 Minn. 63, 63 N. W. 245, and Taney v. Hodson, 170 Minn. 230, 212 N. W. 196, and others of similar import relied upon by appellants are not applicable here. In those cases the guaranty was unlimited in time and amount. In Taney we find the following statement (170 Minn. 231, 212 N. W. 196):

"* * * The guaranties were unlimited as to time and amount and made no provision for their termination by the guarantors."

Under those circumstances we held that the advances must be reasonable and within the contemplation of the parties. Here the exact opposite is true. The amount each of the defendants guaranteed is specified in the instrument he signed, and they had a right to terminate their liability as to future obligations any time they saw fit. None of them did anything except Purdum.

It is conceded that he is not liable for any indebtedness incurred after service of his retraction. Defendant's exhibit 19, plaintiff's ledger sheet, shows that at the time Purdum's retraction was served there was due an amount substantially in excess of Purdum's guaranty, but that subsequent payments on the two notes for which he was liable reduced the balance by December 29, 1965, so that at the commencement of this action there was due and owing on these notes only $6,050.82. It follows that Purdum is liable to plaintiff in only this amount, as the balance of the indebtedness consisted of overdrafts, all of which occurred after Purdum's service of his retraction.

■ The trial court allowed plaintiff to recover attorneys' fees in the amount of $1,907, apparently on the theory that the promissory note

which represented part of the indebtedness for which defendants were held liable contained a provision allowing the recovery of reasonable attorneys' fees in the collection thereof. The trouble is that a substantial part of the attorneys' fees must be apportioned to collection of the overdrafts, not the note, and there is no provision for attorneys' fees for such services. The general rule is that attorneys' fees are not recoverable unless there is a specific contract permitting their recovery or a statute authorizing it. Benson Co-op. Creamery Assn. v. First District Assn. 276 Minn. 520, 151 N. W. (2d) 422. See, also, Abbey v. Farmers Ins. Exch. 281 Minn. 113, 160 N. W. (2d) 709; Grodzicki v. Quast, 276 Minn. 34, 149 N. W. (2d) 8. The action here is not upon the note but upon the guaranty; and even if the guarantors would be liable for attorneys' fees if suit were on the note, the rule would not be applicable here. The court was in error in allowing attorneys' fees.

Inasmuch as the bulk of the record and appellants' brief are relevant only to issues on which respondent prevails, no costs or disbursements are allowed any party.

Affirmed in part. Modified as to the liability of defendant Ralph S. Purdum and reversed as to allowance of attorneys' fees.