## MINNESOTA FEDERAL SAVINGS AND LOAN ASSOCIATION v. CENTRAL ENTERPRISES OF SUPERIOR, INC., AND ANOTHER. UNIVERSAL MOBILE SERVICES CORPORATION, THIRD-PARTY DEFENDANT.

247 N. W. 2d 46.

November 5, 1976—Nos. 46028, 46029.

*Waters, Ince & Tischleder* and *Richard T. Ince,* for Underdahl.

*Carlsen, Greiner & Law* and *Timothy M. O'Brien,* for Universal Mobile Services Corporation.

*John F. Scott, Jr.,* for Minnesota Federal.

Heard before Sheran, C. J., and Rogosheske and Todd, JJ., and considered and decided by the court en banc.

ROGOSHESKE, JUSTICE.

These appeals challenge the trial court's findings and determination of the liability of defendant Leonard C. Underdahl (Underdahl) as guarantor and Universal Mobile Services Corporation (Mobile) for losses sustained by plaintiff, Minnesota Federal Savings and Loan Association (Minnesota Federal), arising out of the latter's financing, under a trust receipt security agreement commonly called a "dealer's floor plan," the purchase of mobile home units for resale by defendant Central Enterprises of Superior, Inc. (Central), a mobile home dealer. Although we affirm Central's liability and Underdahl's liability as guarantor, we find insufficient evidentiary support and legal justification for the court's determination of Mobile's joint and several liability and accordingly remand for a redetermination or retrial of that issue by the trial court.

Minnesota Federal suffered its losses when Central sold nine mobile home units to retail customers between June 1972 and May 1973 and failed to remit that part of the proceeds owed to Minnesota Federal in satisfaction of its floor plan financing of those units under the trust agreement.

Central is a corporation formed and wholly owned by Underdahl, who served as corporate president and treasurer. It began operation of a mobile home sales lot at Jordan, Minnesota, in November 1971. Duwayne M. O'Connell was employed by Underdahl as manager and also served as corporate vice president and secretary. Underdahl maintained his residence in Duluth, Minne-

48

sota, and did not oversee the day-to-day operations, usually visiting the lot monthly plus reviewing his accountant's quarterly reports of Central's financial condition. O'Connell actively managed Central until his death on May 31, 1973. Thereafter, following Underdahl's initial discovery of the sales out of trust, and upon the failure of Central as obligor and Underdahl as guarantor of the corporate obligation to honor the payment demand, Minnesota Federal commenced this action. In response to Underdahl's counterclaim alleging negligence in the handling of Central's account, Minnesota Federal joined Mobile, a mobile home lending program service company, as a third-party defendant, alleging negligent breach of Mobile's service contract to Minnesota Federal and seeking damages therefor, including indemnity of Underdahl's counterclaim against Minnesota Federal.

At the outset of the trial, counsel for Central conceded Central's liability. At the conclusion of the trial, the court ruled in favor of Minnesota Federal against Central and Underdahl in the amount of $13,015.30 and in favor of Minnesota Federal against Central, Underdahl, and Mobile jointly and severally in the additional amount of $57,332.50. Subsequently, the court denied all post-trial motions except to modify its order for judgment against Underdahl and Mobile by providing that either was ntitled to recover from the other any amount paid to Minnesota deral in excess of one-half of $57,332.50. Mobile and Underhl each appeal from the denial of their respective motions for lew trial.

*Minnesota Federal v. Underdahl*

In finding Underdahl liable as a guarantor of Central's obliations, the trial court found the following facts. In response solicitations by Mobile's representatives, on January 10, 1972, ntral, with floor plan financing of $80,000 obtained at arquette National Bank in Minneapolis, applied for additional oor plan financing from Minnesota Federal. The next day, Minesota Federal approved a floor plan loan to Central in the amount of $100,000. At the closing, Underdahl and O'Connell,

as corporate officers of Central, executed a trust receipt security agreement with Minnesota Federal covering the units Central would thereafter place under the floor plan. Both also executed a personal, continuing guaranty of Central's floor plan obligations. Although unconditional as to its limit, the trial judge found that this personal guaranty was limited by the circumstances under which it was given and covered only $100,000 of Minnesota Federal's losses in the event of Central's subsequent default. Central also provided Minnesota Federal with a resolution of Central's board of directors authorizing either Underdahl or O'Connell to handle future transactions between Central and Minnesota Federal. Under the terms of the trust agreement, when a mobile home was added to the floor plan loan, O'Connell on behalf of Central signed a promissory note in the amount of the financing for the unit and a schedule adding the mobile home to the trust receipt security. When Central made payment in full to Minnesota Federal for a mobile home unit covered by the floor plan, Central's promissory note and the schedule adding the unit to the floor plan were returned to Central.

In September 1972, the Marquette floor plan financing was combined with Minnesota Federal's by O'Connell to produce one floor plan financing obligation to Minnesota Federal with a $180,000 limit. The trial court found that the unrevoked resolution of Central's board of directors given to Minnesota Federal on January 24, 1972, authorized O'Connell as a corporate officer to act on the company's behalf with respect to the increase to $180,000 of the company's floor plan financing at Minnesota Federal. At trial, Underdahl denied being aware of the increase in the floor plan limit from $100,000 to $180,000 until June 1973. In his deposition before trial, however, Underdahl admitted learning orally from O'Connell of the new limit in August 1972. A letter confirming and acknowledging this new floor plan limit was sent to the offices of Central in August 1972. By reason of Central's failure to pay Minnesota Federal the amounts owing it for the nine mobile homes sold out of trust, the court found

Underdahl, as guarantor, liable to Minnesota Federal in the amount of $64,342.50, which represented losses for all nine units sold out of trust, with accrued interest of $6,005.30, for a total of $70,347.80.

Underdahl contends that, when Central and Minnesota Federal agreed in August 1972 to raise the floor plan financing limit from $100,000 to $180,000 without his express written consent, he was discharged as guarantor by this claimed material alteration in the contract between principal and creditor. Underdahl relies on the principle that any change in the relation between principal and creditor which results in larger responsibilities or liabilities on the part of the principal, made without consent of the guarantor, acts as a discharge of the guarantor. 38 Am. Jur. 2d, Guaranty, § 81; Schmidt v. McKenzie, 215 Minn. 1, 9 N. W. 2d 1 (1943).

We affirm the trial court's determination that Underdahl is not discharged from his guaranty to Minnesota Federal. The original guaranty promise by Underdahl contemplated that the debt between Central and the bank would fluctuate, since Central, by corporate resolution signed by Underdahl, expressly authorized O'Connell to sign future note paper, and Underdahl expressly waived notice of acceptance by the bank of the guaranty on future indebtedness. The change in the floor plan financing limit was not therefore a material alteration in the relation of Central and Minnesota Federal but merely a modification in the principal contract which was contemplated in the original guaranty. In 38 Am. Jur. 2d, Guaranty, § 83, it is stated:

"If the guaranty contract contains a provision which contemplates or authorizes a change in the terms of the principal contract, a change within the scope of such authorization does not discharge the guarantor."

Underdahl's guaranty was continuing and unconditional as to amount and in our opinion plainly contemplated future increases and decreases in the indebtedness of Central.

The trial court found that Underdahl's personal guaranty was limited by the circumstances under which it was given and covered no more than $100,000 in the event of a future default by Central. The trial judge did not find, however, that Underdahl at the time of executing his guaranty intended to be a guarantor of Central only as long as Central operated under a $100,000 floor plan. Indeed, the fact that Underdahl's personal guaranty did not specify any sum certain as a limit indicates that both the bank and Underdahl contemplated that the future indebtedness limit of Central with the bank would be modified. Accordingly, the later modification of the floor plan limit did not operate to discharge Underdahl as guarantor. At no time during the relevant period did Underdahl ever send notice of termination of his guaranty to the bank. Underdahl is thus liable on his guaranty up to the limit of $100,000 found by the trial judge to be implied in the circumstances surrounding the execution of the guaranty. Accord, Midway Nat. Bank v. Gustafson, 282 Minn. 73, 165 N. W. 2d 218 (1968).[1]

---

[1] Even if we were to assume arguendo that the change in Central's financing limit would operate to discharge Underdahl if made without his consent, such consent can be implied from Underdahl's conduct subsequent to the increase in Central's floor plan limit in August 1972. Specifically, we note that (1) Underdahl was president of the corporation (Central) which agreed to the increased floor plan limit; (2) Underdahl read and reviewed quarterly reports on Central's financial condition and financing and thus must have learned of the new floor plan financing limit; and (3) Underdahl usually visited the Central lot monthly and reviewed Central's inventory and sales. The trial court found the foregoing facts and concluded that Underdahl should have learned of the increase in the floor plan limit. In a pretrial deposition, Underdahl admitted learning of the change from O'Connell in August 1972. In the circumstances, it is virtually impossible to believe that Underdahl was unaware of the fact that his $80,000 personal guaranty with the Marquette Bank had been satisfied by Central when it consolidated its floor plans with Minnesota Federal. If in fact Underdahl knew of the change in the floor plan limit with Minnesota Federal in August 1972 or shortly thereafter, and never gave notice to the bank of termination of his guaranty contract but instead continued to act as if the guaranty

Underdahl's second contention is that the bank through its agent (Mobile) was negligent in its dealings with the principal debtor (Central) and that this negligence discharges Underdahl on his personal guaranty to the bank. In support of this claim, Underdahl relies principally on the language from 18 Dunnell, Dig. (3 ed.) § 9093, which states:

"The principal and the creditor are bound to exercise the utmost good faith toward the surety in relation to the debt. If the creditor does any act injurious to the surety or inconsistent with his rights, *or if he omits to do any act, when required by the surety*, which his duty enjoins him to do and the omission proves injurious to the surety, the surety is discharged." (Italics supplied.)

See, also, Stearns, Suretyship (5 ed.) § 6.49. The Minnesota Uniform Commercial Code defines good faith as "honesty in fact in the conduct or transaction concerned." Minn. St. 336.1—201 (19). Under the above test, in our view this defense is not established. While, as will later appear, Mobile owed a contractual duty of non-negligent inspection to the bank, the bank owed no express or implied duty to Underdahl as guarantor to inspect the sales lot of Underdahl's own company, Central, to detect the absence of units sold out of trust. While the trial court did find Minnesota Federal negligent as to one unit and Mobile negligent as to eight units in making inspections, it made no finding that either acted in bad faith toward Underdahl by being dishonest or deceitful. In Midway Nat. Bank v. Gustafson, 282 Minn. 73, 79, 165 N. W. 2d 218, 223, we noted:

"While it is true that a creditor owes a surety the obligation of acting in good faith, * * * the creditor is not obliged to look after the interests of the surety; ordinarily, it is up to the surety to see to it that the principal performs his duty."

---

were still in force, then Underdahl by his conduct waived any defense based on the alteration of the principal contract between Central and the bank.

This rule would seem particularly appropriate here where the guarantor is the president and sole shareholder of the debtor and thus the person in the best position to see to it that the principal performs its duty and does not breach its trust with the creditor bank. In the present case, the only negligence imputable to the creditor is the failure to discover the intentional deceit of the principal *debtor* in selling units out of trust and presumably using the proceeds for its corporate benefit. In our view, neither Mobile nor the bank owed a duty *to Underdahl* to conduct inspections of the Central lot. We accordingly affirm the judgment below with respect to Underdahl's liability to Minnesota Federal for all losses sustained by the bank due to Central's default.

### *Minnesota Federal v. Mobile.*

On November 30, 1970, plaintiff Minnesota Federal entered into an agreement with third-party defendant Mobile for service to Minnesota Federal by Mobile of a mobile home lending program to be started by Minnesota Federal. Under the terms of this agreement, Mobile was to contact mobile home dealers in Minnesota and solicit their use of Minnesota Federal's mobile home dealer floor plan financing in exchange for a negotiated commission. In addition to placing other responsibilities with Mobile, the agreement between Minnesota Federal and Mobile provided in pertinent part:

"At the Association's request Mobile will arrange for a fraud policy of insurance covering any dealer floor plan arrangement *and will monthly inspect the dealer's new mobile home inventory.* At its option, the Association may also inspect these inventories." (Italics supplied.)

The monthly audits of mobile homes on the Central lot which Mobile agreed to provide were made from audit forms furnished to Minnesota Federal by Mobile. Minnesota Federal personnel prepared the audit report from the inventory, of units floor planned by Central. These audit reports identified the make, the serial number, and the year of manufacture of the units.

The mobile homes were first listed on the audit report for the month following that in which they were added to the floor plan. After the report was prepared, it was turned over to one Jack F. Wilson, Mobile's representative, for use in his audit inspection. Following this inspection, Wilson returned his audit report to Minnesota Federal with appropriate information about the presence, absence, and condition of the mobile homes listed thereon. None of the audit reports of his inspections in the consecutive months from September 1972 to May 1973 could be found, and they were not produced at trial. Wilson testified that he made monthly inventory audits of Central's lot in each of these 9 months and found no mobile homes missing from the Central lot in any of his monthly inspections, notwithstanding the fact that Central's records indicated that the nine mobile homes sold out of trust were delivered to retail customers during this period. The trial judge found this testimony implausible and concluded that Wilson's inventory inspections had been negligently and carelessly performed in breach of Mobile's contractual duty. The trial court found, however, that one Gerald Meis, an employee of Minnesota Federal, performed an inventory audit inspection on August 4, 1972, which audit included one of the nine missing homes (Marshfield No. 15596) and which inspection should have uncovered the absence of that unit from Central's sales lot. The trial judge thus found Mobile liable to Minnesota Federal for eight of the mobile homes sold out of trust, resulting in the loss of $57,332.50 in unremitted sales proceeds.

Mobile contends that there is insufficient evidence to support the trial court's finding that Mobile was negligent due to the allegedly faulty inspections of the Central lot by Wilson. Our careful review of the record and the findings of the trial judge leads us to conclude that there is substance to this claim. The trial judge apparently assumed that Wilson received from Minnesota Federal an accurate inventory listing of the mobile home units on the Central lot during the months in question when the

eight units were sold out of trust. The trial judge thus concluded that Wilson's testimony that he found no missing units was simply not believable. The deficiency in this conclusion is the absence of any finding, citing corroborative evidence, which would support the crucial assumption that the pertinent audit reports did contain a correct inventory of every mobile home on the lot under financing. There was no direct proof adduced at trial to support such a finding, since the audit reports were missing and were not produced at trial even though they were prepared, returned, and filed in the offices of Minnesota Federal with no contractual obligation of Mobile to keep such records. It is conceivable that on this record the trial judge could have found that the now-missing audit reports were accurate but the court made no such finding, a foundational fact essential to the judge's conclusion that Wilson's testimony defied probability. Because we conclude that the findings of fact below are incomplete, we believe that a reexamination by the trial court of the evidence or a retrial as to Mobile's liability is required.

We also reverse and remand for reconsideration by the trial court its finding and conclusion relating to the measure of damages owed to Minnesota Federal by Mobile if Mobile is found on remand to have been negligent in performing its contractual duty to inspect the Central lot inventory. We know of no rule of law that would support the court's conclusion that Mobile is jointly and severally liable with Underdahl for the losses from the sale of the eight units out of trust. Assuming, as we do, that the bank will be made whole by Underdahl's payment of the judgment, it is not clear to us how the bank has been damaged, even assuming adequate proof of Mobile's causal negligence for the loss of the eight mobile homes. As to the proper measure of damages for any liability of Mobile, we express no opinion.

Because of our disposition of the above matters, we find it neither necessary nor appropriate to consider the other issues raised by the parties.

Affirmed in part, reversed in part, and remanded for a recon-

sideration or retrial by the trial court of the factual basis for its finding as to Mobile's liability and the legal justification, if any, for imposing joint and several liability upon Mobile.

Costs and disbursements to any of the parties are disallowed.