LOVING & ASSOCIATES, INC., Appellant,

v.

Gibson **CAROTHERS**, Respondent.

No. C6–00–718.

Court of Appeals of Minnesota.

Dec. 5, 2000.

Christopher S. Hayhoe, Michael R. Schechter, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, for appellant.

Thomas J. Flynn, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, for respondent.

Considered and decided by
KLAPHAKE, Presiding Judge,
LANSING, Judge, and SCHUMACHER, Judge.

## OPINION

LANSING, Judge.

Loving & Associates, Inc., sued Gibson Carothers to enforce a personal guaranty he issued to Loving to secure a line of credit to Lake Street Shirts, Inc. The district court granted Carothers summary judgment on Loving's claims, reasoning that the 1992 merger of Lake Street Shirts, Inc., and Stafford Blaine Designs, Ltd., discharged Carothers's obligations under the guaranty by operation of law. Because we conclude that a merger does not necessarily discharge a guaranty by operation of law and that genuine issues of material fact remain to be decided, we reverse and remand.

## FACTS

Lake Street Shirts, Inc. (LSS), is a Minnesota corporation in the business of screen-printing t-shirts and sweatshirts for sale to card and gift shops nationwide. Gibson Carothers and Herbert Fick incorporated LSS in 1989. Carothers owned 26% of the company's stock and was its chairman and a director. But he was not involved in the company's day-to-day operations.

In April 1989, LSS sought a line of credit from Loving & Associates, Inc., a national supplier of athletic apparel. Loving agreed to extend LSS credit, but it insisted on a personal guaranty from Carothers. Carothers thus signed a personal guaranty securing payment of "all sums owed by the Company [identified as 'Lake Street Shirts'] to Loving and the performance by the Company of all terms and conditions of purchase orders * * * whether now existing or hereinafter entered into between the Company and Loving." The guaranty was a continuing guaranty revocable only "by notice in writing to Loving." Carothers did not envision the possibility of a merger when he signed the guaranty.

In 1992, a major distributor of LSS decided it would no longer distribute LSS shirts. In response, Fick proposed a merger between LSS and Stafford Blaine Designs, Ltd. (Stafford I), a company Fick had incorporated in 1988 to distribute high-end, licensed, screen-printed clothing. Carothers was not a shareholder in Stafford I and was not involved in its management or day-to-day operations.

In August 1992, LSS and Stafford I merged into Stafford–Lake, Inc ., which later assumed the name Stafford–Blaine Designs, Ltd. (Stafford II). According to Fick, other than as a minority shareholder, "Carothers had essentially no say in whether the companies merged or not." Under the terms of the merger agreement, LSS and Stafford I ceased to exist and Stafford–Lake, the surviving corporation, assumed their liabilities and obligations. The merger agreement also provided that the merger would not affect the rights of the constituent corporations' creditors. Carothers received a 12% ownership share in Stafford II.

The record shows no perceptible change in LSS's operating procedures or management structure after the merger. LSS retained its pre-merger address and continued to operate under the name Lake Street Shirts Co. pursuant to a certificate of assumed name Stafford II filed in 1993. Fick continued to manage LSS and remained Loving's principal contact. In turn, Loving continued to extend credit to LSS on the same terms as before the merger. At Fick's request, Loving maintained separate accounts for LSS, Stafford I, and Aardvark Graphics, Stafford I's predecessor.

The parties disagree on when Fick informed Loving of the merger. Without specifying a time frame, Fick claims he told Loving of the merger and apprised Loving of the financial status of the newly formed corporation from time to time thereafter. Loving, on the other hand, claims it first learned of the merger in December 1995, when Fick wrote a letter to all creditors informing them that Stafford II was having financial difficulties.

At the time of the merger, LSS was grossing approximately $3 million in annual sales. Stafford I was grossing $3.7 million. Although the merger forced Stafford II to move into a more expensive facility and resulted in increased operating expenses, Stafford II remained profitable and paid Loving's bills through 1994.

In 1995, however, Stafford II began experiencing financial difficulties as a result of rapid expansion, poor management, production difficulties, and industry changes. In response, it sent all creditors several proposals to restructure the debt. Loving was among Stafford II's creditors, and it was also on the committee assigned to review the restructuring proposals and to report to the remaining creditors. Although Stafford II continued to operate under the various plans agreed to by its creditors, in 1998 management decided to sell the company's assets.

Relying on Carothers's guaranty, Loving then brought this action to recover $37,529.98 owing on the LSS account for goods delivered between November and December 1995.[1] Carothers refused payment and moved for summary judgment, claiming the merger had discharged the guaranty by operation of law. Loving opposed Carothers's summary-judgment motion but did not move for summary judgment itself. The district court agreed that the merger had discharged the guaranty

by operation of law and granted Carothers summary judgment. This appeal followed.

## ISSUE

As a matter of law, did the merger between Lake Street Shirts, Inc., and Stafford–Blaine Designs, Ltd., discharge Carothers from liability under the guaranty for the post-merger performance of Lake Street Shirts?

## ANALYSIS

Whether a continuing guaranty extends to debts incurred by a debtor after it merges with another organization is a question of first impression in Minnesota. Relying on Minn.Stat. § 302A.641 (1998), the district court held that the merger of LSS and Stafford I discharged Carothers's obligations under the guaranty by operation of law because LSS ceased to exist upon the merger. Alternatively, the district court held that the guaranty unambiguously extended only to the debts of the company originally existing as Lake Street Shirts. We disagree that Carothers has established a basis for summary judgment on either ground.

### I. The Effect of the Merger Statute

Minn.Stat. § 302A.641 governs the effect of mergers. It provides that upon a merger, "[t]he separate existence of all constituent organizations * * * ceases[.]" Minn.Stat. § 302A.641, subd. 2(b). But it also provides that the surviving organization inherits the rights and privileges of the constituent organizations and becomes responsible for their liabilities and obligations. Id., subd. 2(d), (e). For that reason, a constituent organization ceases to exist upon a merger only in the sense that it has no *separate* existence.

A corporation is essentially the legal identity of a set of contractual obli-

1. Stafford I owed Loving more than $100,000 for goods delivered between October 1995 and March 1998. Loving brought a separate action against Fick, seeking to enforce Fick's personal guaranty for Stafford I's debts. The

district court denied Fick summary judgment on Loving's claims, reasoning that issues of material fact remained on whether Fick's post-merger conduct evidenced an intent to honor the guaranty as a continuing guaranty.

gations and entitlements. *United States Shoe Corp. v. Hackett*, 793 F.2d 161, 163 (7th Cir.1986). These obligations and entitlements do not cease to exist when the legal identity that embodies them changes. Instead, they transfer to the surviving organization by operation of law. *Id.* at 163–64. A merger does not, therefore, necessarily extinguish a continuing guaranty as a matter of law. *See CBS, Inc. v. Film Corp. of America*, 545 F.Supp. 1382, 1387 (E.D.Pa.1982) (concluding "the rights of a company pursuant to a guaranty agreement survive the merger of that company with another, even though the originally guaranteed company is not the survivor corporation of the merger"); *see also Essex Int'l, Inc. v. Clamage*, 440 F.2d 547, 550 (7th Cir.1971) (stating "a merger or consolidation involving the creditor corporation does not necessarily discharge a guarantor any more than a mere change in corporate name does").

By the same token, a continuing guaranty is not enforceable as a matter of law merely because it survives a merger. Contrary to Loving's argument, a guaranty is not a "right or privilege" of a constituent organization within the meaning of Minn.Stat. § 302A.641, subd. 2(d). Instead, it is an independent contract between a guarantor and a creditor and is collateral to the contractual obligation between the creditor and a debtor. *Schmidt v. McKenzie*, 215 Minn. 1, 6–8, 9 N.W.2d 1, 3–4 (1943). Because guaranties confer a right on the creditor rather than the debtor, a guaranty securing the performance of a constituent organization does not vest in the surviving corporation upon a merger by operation of Minn.Stat. § 302A.641, subd. 2(d). *See Worth Corp. v. Metropolitan Cas. Ins. Co.*, 142 Misc. 734, 255 N.Y.S. 470, 472 (App.Term 1932) (stating surety's post-merger liability does not depend on whether surviving corporation succeeds to constituent corporation's assets).

Through caselaw, courts have developed a rule that combines both contractual and a multi-factor equitable analysis to determine whether a guaranty is en-

forceable after a debtor undergoes a change in composition or business structure. Virtually all courts agree that whether a guaranty is enforceable to secure post-merger obligations depends in the first instance on the terms of the guaranty. But when a guarantee does not provide for the contingency of a change in the debtor's composition or business structure, the inquiry necessarily broadens to whether the merger alters the debtor's identity significantly and thereby changes without the debtor's consent the obligation the guarantor initially assumed under the guaranty. *See, e.g., United States Shoe Corp.*, 793 F.2d at 162–63; *Essex*, 440 F.2d at 550. Combining a contractual and a multi-factor equitable or commercial-reasonableness analysis prevents a guarantor from circumventing a continuing guaranty simply by changing the name, composition, or legal identity of the organization whose performance the guaranty secures and thereby guards against the elevation of form over substance. This dual approach is consistent with the Restatement of Suretyship and Guaranty. *See* Restatement (Third) of Suretyship and Guaranty § 37 (1996). We adopt this approach in evaluating whether the guaranty at issue in this case extends to LSS's post-merger debts.

## II. The Terms of the Guaranty

We first turn to the terms of the guaranty. Because a guaranty is a contract, its terms must be understood in their plain and ordinary sense in light of the parties' intentions and the circumstances under which the guaranty was given. *Marquette Trust Co. v. Doyle*, 176 Minn. 529, 533, 224 N.W. 149, 151 (1929). The terms of a guarantor's obligation may not be unduly restricted by technical interpretation. *Bradshaw v. Barber*, 125 Minn. 479, 481–82, 147 N.W. 650, 650 (1914). Nor, on the other hand, may they be enlarged beyond the fair and natural import of the guaranty's terms. *Id.*

Relying on the terms of the guaranty and on *Borg Warner Acceptance Corp. v. Shakopee Sports Ctr., Inc.,* 431 N.W.2d 539 (Minn.1988), Loving argues the guaranty unambiguously extends to the post-merger debts of LSS because it is unconditional and revocable only by written notice to Loving. In *Borg Warner,* the court held that stockholders who had withdrawn from the corporation whose debts they had guaranteed remained liable for obligations the corporation incurred after they withdrew because they failed to revoke the guaranty. *Id.* at 541.

■ We disagree that Carothers's failure to revoke the guaranty renders it enforceable as a matter of law. Because an unrevoked continuing guaranty may be revoked by operation of law, a guarantor's failure to revoke, although relevant, is not dispositive. *Borg Warner* is limited to its facts and applies only in cases in which the principal retains its identity after undergoing a change in composition or structure.

■ Carothers does not dispute that the guaranty, until terminated, is enforceable to secure LSS's pre-merger debts. But he argues he is not liable for LSS's post-merger obligations because, by its terms, the guaranty unambiguously secures only the pre-merger performance of Lake Street Shirts, not its post-merger performance. Carothers claims that because the parties did not contemplate a merger when they signed the guaranty, to construe the guaranty as extending to LSS's post-merger performance would amount to redrafting the original contract. Carothers relies on *Wheeling Steel Corp. v. Neu,* 90 F.2d 139 (8th Cir.1937), a case in which the court refused to hold the guarantor liable for the obligations of a company other than the company specifically referred to in the guaranty, even though both companies were substantially identical.

We are not persuaded by Carothers's claim that the guaranty unambiguously extends only to Lake Street Shirts's pre-merger performance. By its terms, the guaranty extends to "the performance by [Lake Street Shirts] of all terms and con-ditions of purchase orders * * * whether now existing or hereinafter entered into between [Lake Street Shirts] and Loving." The guaranty unconditionally guarantees the present and future performance of "Lake Street Shirts" and is silent on the consequences of a merger. By asking us to read the guaranty as extending only to the pre-merger performance of Lake Street Shirts, Carothers is thus asking us to read a limitation into the guaranty that may have been intended but is neither expressly stated nor reasonably implied. We decline to do so. Instead, we conclude that absent language expressly disclaiming or assuming liability for Lake Street Shirts's performance in the event of a merger, the guaranty's enforceability depends on whether the merger changed the identity of Lake Street Shirts and imposed on Carothers without his consent an obligation that differed materially from the obligation he undertook when he signed the guaranty.

### III. New Identity and Increased Risk

■ Whether changes in the principal are of sufficient magnitude to justify releasing a guarantor is a determination courts must make on a case-by-case basis. *Fehr Bros., Inc. v. Scheinman,* 121 A.D.2d 13, 509 N.Y.S.2d 304, 307–08 (1986). Courts agree that minimal changes do not affect a guarantor's obligation. *See* Annotation, *Change in Name, Location, Composition, or Structure of Obligor Commercial Enterprise Subsequent to Execution of Guaranty or Surety Agreement as Affecting Liability of Guarantor or Surety to the Obligee,* 69 A.L.R.3d 567, 572 (1976). The reincorporation and name-change of a principal, for example, have been held to be insufficient to discharge a guarantor's obligations absent a corresponding change in operating procedures or business structure. *See, e.g., Folk v. Continental Can Co.,* 97 F.2d 322, 324 (4th Cir.1938) (upholding guaranty after change in principal's business structure on finding that "[t]he business of the old company was conducted as usual by the [new company]

with substantially the same officers and with the same assets which the new company had absorbed"). This is particularly true when the guarantor himself participates in the change or the change could reasonably have been anticipated. *See, e.g., New York Am., Inc. v. Hub Advertising Agency,* 136 Misc. 596, 240 N.Y.S. 367, 368 (N.Y.City Ct.1930) (holding guarantor was "estopped from using the cloak of a corporate entity to which he himself was a party to relieve him of any liability under [guaranty issued before incorporation to secure partnership's debts]"); *People v. Backus,* 117 N.Y. 196, 22 N.E. 759, 760 (1889) (upholding guaranty after bank's corporate existence was extended through renewal of its charter pursuant to an amendment to the National Banking Act on finding that guarantors had signed the guaranty knowing that bank was subject to banking laws, which could be amended at any time); *Richardson v. Steuben County,* 226 N.Y. 13, 122 N.E. 449, 451–52 (1919) (holding change in membership of partnership that owned bank did not release surety from liability for bank's obligations because banking houses ordinarily continue their identity for generations and could do so only through a constant succession of partners).

Whether more substantial changes in the principal affect a guarantor's obligation depends primarily on (a) whether the changes result in a new principal in terms of management, control, operating procedures, and business dealings; and (b) whether the changes materially alter the nature of the performance required of the guarantor. Thus, changes that allow the principal to survive as an independent entity and do not affect the guarantor's original undertaking do not discharge a guaranty. *See, e.g., Alton Banking & Trust Co. v. Sweeney,* 135 Ill. App.3d 96, 89 Ill.Dec. 926, 481 N.E.2d 769, 773–74 (1985) (change in principal's business from used-car lot to new-car dealership did not constitute material change warranting guarantor's release from obligations under continuing guaranty, where guarantor owned both businesses and as-

sented to the change, and amount of dealership's indebtedness did not exceed amount specified in guaranty); *New York Am.,* 240 N.Y.S. at 368 (partnership's decision to incorporate did not release partner-guarantor from liability for new corporation's debts because new corporation continued to conduct same business, at same address, under same name, with same directors and stockholders; business relation between creditor and principal continued unaffected; and partner-guarantor participated in decision to incorporate and became stockholder and director of newly formed corporation); *Caldor, Inc. v. Mattel, Inc.,* 817 F.Supp. 408 (S.D.N.Y.1993) (finding that merger and subsequent spinoff of subsidiary, with resulting loss of control by parent-guarantor, did not fundamentally alter parent-guarantor's risk under guaranty because subsidiary continued to operate same business under substantially same conditions as before merger and spinoff).

On the other hand, changes that result in a significantly different business organization and increase the guarantor's exposure to liability serve to release the guarantor from obligations under the guaranty. Thus, the merger of a principal into another corporation discharged the guarantor's obligation under a continuing guaranty because the principal did not survive the merger as an independent entity. *Worth Corp.,* 255 N.Y.S. at 474–75. Instead, it assumed the name, character, corporate structure, and organization of the surviving corporation. *Id.* at 473. Similarly, the incorporation of a sole proprietorship and the subsequent acquisition of majority control by new stockholders released the guarantors from liability because they changed "the essential nature of the business enterprise[,]" diluted the guarantors' control over the business, and "greatly expanded" their liability. *Teledyne Mid–Am. Corp. v. HOH Corp.,* 486 F.2d 987, 990 (9th Cir.1973).

Carothers's post-merger liability under the guaranty thus depends on whether the

merger changed Lake Street Shirts's corporate identity significantly and thereby materially increased the risk Carothers assumed when he signed the guaranty. Other relevant factors include whether Carothers participated in effecting the merger or otherwise assented to it, whether he could reasonably have anticipated a material increase in the risk he assumed under the guaranty, whether Loving had notice of the change before performing, and whether Carothers opted to revoke the guaranty. *See United States Shoe Corp.,* 793 F.2d at 163 (stating "guarantor may consent to the increased risk by creating it"); *Fehr Bros.,* 509 N.Y.S.2d at 310 (concluding guarantor, "in making a voluntary business decision which created the conditions causing the risk to increase and in failing to carry out the simple task of relieving himself of his obligations by providing written notice to plaintiff of his intent to terminate the guaranty, implicitly consented to that increased risk"); *Mountain States Tel. & Tel. v. Lee,* 95 Idaho 134, 504 P.2d 807, 808–09 (1972) (guarantor not released after formation of new principal corporation because he participated in change as stockholder and officer, failed to revoke, and did not inform creditor of the change).

## A. New Identity

█ Our review of the undisputed facts in the record shows that the merger did not result in a significantly new entity, the debts of which Carothers never intended to guarantee. LSS continued to operate the same business, under the same name, at the same address, under substantially the same management. Fick continued to oversee the company's day-to-day operations. The record contains no indication that the company's operating procedures changed. And the relationship between LSS and Loving did not change: Loving continued to extend credit to LSS as an entity separate from Stafford II under the same terms as before the merger, continued to deal with Fick as its principal contact, and continued to maintain a separate account for LSS. The record thus conclusively establishes that LSS did not undergo a change of identity after the merger.

## B. Increased Risk

The next question then is whether as a matter of law the merger materially increased the risk Carothers undertook when he signed the guaranty. Minnesota courts have used an increased-risk analysis in determining whether a material alteration in the contract between the principal and the creditor discharges a guarantor. *See, e.g., Minnesota Fed. Sav. & Loan Ass'n v. Central Enters. of Superior, Inc.,* 311 Minn. 46, 51, 247 N.W.2d 46, 50 (1976); *Estate of Frantz v. Page,* 426 N.W.2d 894, 898 (Minn.App.1988), *review denied* (Minn. Sept. 16, 1988).

Carothers argues that his risk increased as a result of the merger because LSS doubled in size and his control over LSS decreased in direct proportion to his ownership interest in Stafford II. But a bigger business entity does not necessarily create a materially bigger risk. In fact, Stafford II was profitable until 1994 despite the increase in size. Additionally, it is unlikely that Carothers's alleged loss of control over LSS affected his risk under the guaranty because Carothers was not involved in the day-to-day operations of LSS and LSS continued under substantially the same management as before the merger.

Loving argues that because it maintained a separate account for LSS, Carothers's post-merger risk remained limited to LSS's debts and is thus consistent with the risk he assumed when he signed the guaranty. But the record does not establish whether the merger resulted in a significant increase in capital that would have allowed LSS to obtain more credit from Loving than it could have obtained before the merger. Arguably, a significant increase in capital and the resulting increase in LSS's ability to obtain credit may have increased the risk inherent in LSS's separate account when Carothers signed the guaranty. We thus conclude that a question of fact remains on whether the merger

increased Carothers's risk under the guaranty. A fact question also remains on whether Loving knew of the merger before it extended additional credit to LSS. Because the record raises issues of material fact, summary judgment is not appropriate. Accordingly, we reverse and remand.

## DECISION

The merger of LSS and Stafford I did not release Carothers by operation of law from liability under the guaranty for the post-merger performance of LSS. Because the guaranty is silent on the contingency of a merger and fact questions remain on whether the merger impermissibly increased the risk Carothers assumed under the guaranty initially, we reverse and remand.

**Reversed and remanded.**