# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-2867

_____

| | | |
|---|---|---|
| Winthrop Resources Corporation, | * | |
| A Minnesota Corporation, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the District of |
| The Stanley Works, | * | Minnesota. |
| A Connecticut Corporation, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  May 16, 2001

Filed:  August 1, 2001

_____

Before MORRIS SHEPPARD ARNOLD, BRIGHT, and BYE, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

In 1991, The Stanley Works guaranteed a lease of computer equipment from Winthrop Resources Corporation to Taylor Rental Corporation and its successive assignees, which came to include General Rental, Inc. (GR).  Following GR's default on lease payments for equipment rented in 1996 and 1997, Winthrop sued to collect the

debt from Stanley. After a bench trial, the district court[1] held that the defaulted lease payments were outside the scope of the guaranty and entered judgment for Stanley. We affirm.

## I.

Winthrop buys computer equipment and then leases that equipment to its clients. On May 1, 1991, Winthrop leased certain computer equipment to Taylor pursuant to a lease that referred to itself as Lease Agreement No. TA050191. The parties call this the "Master Lease Agreement" and it contained a clause stating that "This Master Agreement shall only cover Equipment leased under the Topic II Project." The Master Lease Agreement did not specify the particular equipment to be leased; instead, it stated that the equipment would be listed on separate lease schedules that would be incorporated into the agreement.

At the same time that Winthrop and Taylor executed the Master Lease Agreement, they executed Lease Schedule No. A, which stated that "This Lease Schedule shall only cover equipment leased under the Topic II Project." Lease Schedule No. A did not specify any particular equipment, either, but did state that the equipment was to be delivered and installed between April, 1991, and January, 1993. Late in 1991 and in 1992, Winthrop and Taylor executed Lease Schedule Nos. A01 through A05, each setting forth both the specific equipment to be leased to Taylor and the lease payment schedule for that equipment.

Contemporaneously with the execution of the Master Lease Agreement and Lease Schedule No. A, Winthrop requested and received a guaranty from Stanley, which at the time was Taylor's parent company. The guaranty was made in consideration of Winthrop's "entering into the lease(s) of personal property and/or

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

Software ... with [Taylor] under the terms of the Lease Agreement No. TA050191, dated May 1, 1991 for Equipment described as _____ [*sic*] with all accessories, attachments, components, and spare parts thereto and other related personal property now or hereafter leased by [Winthrop to Taylor]." Stanley guaranteed "the prompt payment of any and all rental payments of [Taylor] pursuant to the terms of said lease(s)," and granted Winthrop "full power to change, alter, cancel, renew, [and] extend the lease(s)" without altering Stanley's liability under the guaranty. There was no reference in the guaranty to the Topic II project by name.

In 1993, Stanley reaffirmed its guaranty when Taylor assigned its Winthrop lease to a different Stanley subsidiary. A year later, Stanley sold that subsidiary to an entity unrelated to Stanley, but agreed to reaffirm the guaranty. In 1996, Stanley once again affirmed the original guaranty when that entity transferred the Winthrop lease to GR, also unrelated to Stanley.

During the next eight months, GR and Winthrop executed Lease Schedule Nos. 006 and 007, both relating to new equipment designed to replace the equipment received by Taylor between 1991 and 1993. GR subsequently experienced financial problems and defaulted on the payments that it owed under Lease Schedule Nos. 006 and 007. In early 1999, Winthrop informed Stanley that it intended to collect GR's debt (approximately $1.5 million) from Stanley. When Stanley refused to pay, Winthrop sued, but the trial court entered judgment for Stanley.

The court held that the Master Lease Agreement and the guaranty were unambiguous, and that the modification clause of the guaranty allowed Winthrop to modify only the lease schedules, not the Master Lease Agreement itself. Because the equipment listed on Lease Schedule Nos. 006 and 007 was not Topic II equipment, the trial court concluded, the equipment listed on Lease Schedule Nos. 006 and 007 was not within the scope of the Master Lease Agreement and thus was not covered by Stanley's guaranty.

-3-

II.

Winthrop challenges the trial court's interpretation of the Master Lease Agreement and the guaranty on several grounds. We review *de novo* the trial court's determination that the contracts were unambiguous, *see John Morrell and Co. v. Local Union 304A of the United Food and Commercial Workers*, 913 F.2d 544, 550 (8th Cir. 1990), *cert. denied*, 500 U.S. 905 (1991), as well as its interpretation of what it concluded to be unambiguous contracts, *see Porous Media Corp. v. Midland Brake, Inc.*, 220 F.3d 954, 959-60 (8th Cir. 2000). We review the trial court's factual findings, however, for clear error. *See Mohamed v. UNUM Life Insurance Co.*, 129 F.3d 478, 480 (8th Cir. 1997). As a federal court sitting in diversity jurisdiction, we apply the law that the forum state would apply. *See Klaxon Co. v. Stentor Electric Manufacturing Company, Inc.*, 313 U.S. 487, 496-97 (1941). We apply Minnesota law to this case because it is both the law of the forum and the law selected by the Master Lease Agreement.

Winthrop's primary contention is that the trial court inaccurately interpreted the scope of the modification clause of the guaranty. In Winthrop's view, the language of the guaranty allowing Winthrop to "change, alter, cancel, renew, [and] extend the lease(s)" gave it a free hand in its dealings with Taylor and Taylor's assignees by allowing Winthrop to change any provision in either the Master Lease Agreement or the lease schedules without altering Stanley's liability under the guaranty. In particular, Winthrop maintains that it could change the Master Lease Agreement by removing the limitation specifying applicability only to the Topic II project and that Winthrop did just that by agreeing to Lease Schedule Nos. 006 and 007 with GR.

We believe, as did the trial court, that Winthrop has construed its powers under the modification clause too broadly by reading the definition of "lease(s)" as including the Master Lease Agreement. The guaranty states that Winthrop and Taylor will enter into "lease(s) ... under the terms of the Lease Agreement." This language unambiguously indicates that the term "lease(s)" is not interchangeable with the term

-4-

"Lease Agreement," for the "lease(s)" are to be executed only under terms provided by the "Lease Agreement." The term "lease(s)" must thus refer to something other than the Lease Agreement as a whole.

The only components of the contract, however, are the Master Lease Agreement and the lease schedules, and thus the only reasonable reading of "lease(s)" is one synonymous with the lease schedules. Indeed, Lease Schedule No. A states that it "is issued pursuant to the Lease Agreement," as the guaranty says that the "lease(s)" will be. Because the guaranty and Lease Schedule No. A (as well as the Master Lease Agreement) were executed in the same transaction, we may construe them in reference to one another, *see Fredrich v. Independent School District No. 720*, 465 N.W.2d 692, 695 (Minn. Ct. App. 1991), and "ascertain and give effect to the intention of the parties as expressed in the language used" in the contract, *Horton Manufacturing Company, Inc. v. Tol-O-Matic, Inc.*, 973 F.2d 649, 651 (8th Cir. 1992). Because the guaranty's use of the term "lease" harmonizes with the language of Lease Schedule No. A, we conclude that the term "lease(s)" refers unambiguously to the lease schedules.

Our interpretation is buttressed by the use of the plural term "lease(s)," because this contemplates something of which there might be more than one. While there is only one Lease Agreement, there could be (and indeed are) several lease schedules. The language used in the guaranty unambiguously distinguishes between a plural set of "lease(s)" and the singular "Lease Agreement," and the only reasonable reading of the term "lease(s)" is in reference to the lease schedules. We therefore conclude that, without altering Stanley's liability under the guaranty, the sole power to modify that the guaranty gave to Winthrop was one affecting the lease schedules only.

Winthrop's objections to this interpretation are unavailing. First, Winthrop points to the Master Lease Agreement, which indicates that the term "Lease Agreement" is to include the lease schedules. Although this is true, this does not prove as much as Winthrop believes that it does. Once the parties execute the lease schedules, the

schedules become a subset of the documents contained in the Lease Agreement. This does not, however, change their status as "lease(s)," nor does it convert the Master Lease Agreement into a "lease" for purposes of the modification clause. Nothing in the guaranty supports Winthrop's contention that the terms "lease(s)" and "Lease Agreement" may be used interchangeably, and the clear language of the guaranty indicates that the terms have separate meanings.

If the modification clause had allowed Winthrop to modify the "Lease Agreement," of course, Winthrop's power to modify would have extended to the Master Lease Agreement as well as to the lease schedules; this was not, however, what the parties agreed to. A guaranty is to be interpreted the same way as any other contract, and therefore we may not enlarge the terms of the guaranty "beyond the fair and natural import of [its] terms," *Loving and Associates, Inc. v. Carothers*, 619 N.W.2d 782, 786 (Minn. Ct. App. 2000).

Winthrop also contends that our proposed construction would violate principles that Minnesota has adopted for interpreting contracts because it would cause the modification clause to become a nullity. *See Independent School District No. 877 v. Loberg Plumbing and Heating Co.*, 123 N.W.2d 793, 799-800 (Minn. 1963). Under our interpretation of the guaranty, however, Winthrop retains broad powers to change many terms of the lease schedules, including the price and the duration of each lease schedule. The modification clause is clearly not a nullity. We therefore reject Winthrop's contentions and agree with the trial court that the modification clause of the guaranty did not allow Winthrop to modify the Master Lease Agreement, specifically, the Topic II language.

### III.

Having concluded that Winthrop was not empowered to modify the Topic II language of the Master Lease Agreement, we may briefly dispose of Winthrop's remaining challenges. Winthrop maintains first that the language of the guaranty stating

that it covers all "related personal property now or hereafter leased" by Winthrop to Taylor created a continuing guaranty for all property that Winthrop leased to Taylor, including property not related to the Topic II project. This language, however, is limited by the overall scope of the guaranty, which we have already held included the Topic II limitation. In fact, this language is contained in the same sentence as the reference to the Master Lease Agreement, and indicates that the property must be "related" to the Master Lease Agreement, and, accordingly, to the Topic II project. The guaranty, therefore, was clearly limited to property that was "now or hereafter" to be leased to Taylor pursuant to the Topic II project, a project that had not yet commenced when the guaranty was executed.

Winthrop's next contention is that Stanley consented to an extension of the guaranty to Lease Schedule Nos. 006 and 007 by reaffirming the guaranty in 1996. Winthrop presented no evidence, however, to support an inference that Stanley's reaffirmation in any way extended the guaranty beyond the original Topic II limitation, as the reaffirmation appears to have been related simply to a *pro forma* change in GR's corporate structure. Winthrop knew that Stanley was not aware of the proposed Lease Schedule Nos. 006 and 007 and that Stanley was not in a position of corporate control over GR. Although Winthrop contends that it relied on Stanley's consent when executing Lease Schedule Nos. 006 and 007, that reliance was clearly unreasonable, because there is no evidence whatever that Stanley consented to an extension of the guaranty to cover these leases. *See, e.g.*, *Nicollet Restoration, Inc. v. City of St. Paul*, 533 N.W.2d 845, 848 (Minn. 1995).

Finally, Winthrop contends that the equipment listed in Lease Schedule Nos. 006 and 007 is a natural extension of the equipment listed in Lease Schedule Nos. A01 through A05, that all of the equipment in the various lease schedules is therefore part of the Topic II project, and that the equipment listed in Lease Schedule Nos. 006 and 007 was thus within the scope of the guaranty. The trial court, however, found that the Topic II project was limited to equipment leased prior to 1993, and this finding is not

clearly erroneous.  We therefore reject Winthrop's contentions, and hold that Stanley's guaranty was limited to the Topic II project and did not extend to the equipment listed in Lease Schedule Nos. 006 and 007.

IV.

For the foregoing reasons, we affirm the judgment of the trial court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.